Matthews *v.* The State.

SANDY MATTHEWS *v.* THE STATE.

1. CRIMINAL LAW. *Prisoner present at trial.* *When.* A prisoner in the dock in a position to see and hear all that is done, and has the opportunity to interpose objections, is in law present at the trial, and a new trial will not be granted because two jurors were accepted by his counsel while so confined in the dock.

2. SAME. *Prisoner should not be manacled.* A prisoner should not be manacled or handcuffed during his trial, but if a juror is selected, by his counsel, upon the trial, when by inadvertence he is so handcuffed, it is not error for which a reversal will be had.

3. SAME. *Confessions.* To say to the prisoner that "an honest confession is good for the soul," is not a promise of temporal benefit or discharge from punishment for the crime charged as will render a confession inadmissible.

FROM SHELBY.

Appeal in error from the Criminal Court of Shelby county. L. B. HORRIGAN, J.

J. T. MOSS for Matthews.

ATTORNEY-GENERAL LEA for the State.

DEADERICK, C. J., delivered the opinion of the court.

Plaintiff in error was convicted in the criminal court of Shelby county, of murder in the first degree and sentenced to be hanged, and has appealed to this court.

If the testimony of Bettie Hicks be true, it was a most atrocious murder. She testifies that deceased

Matthews *v.* The State.

was sitting near the door of prisoner's house, in friendly conversation with him, when the prisoner struck him with an axe in the head, and repeated the blow after deceased had fallen; that he then dragged him round by the kitchen chimney and severed his head from his body; that several hours later, about dusk the prisoner compelled the witness to assist in taking the body about two hundred yards from the house, where he buried it; finding that the hole he had dug was not large enough to receive the body, he cut off the arms and legs and pressed these mangled and dissevered remains into the hole and covered them with an old quilt and dirt. This is, in substance, her account of the tragedy, which occurred in October, 1881. She states the prisoner, who is her step-father, threatened to kill her if she told, and kept constant watch over her to prevent her leaving home or having an opportunity to communicate with others. But that, finally, about three months after the killing, being relieved from his control, she did communicate the facts to others, and search being made the body was found in the mutilated condition described by her, and identified.

Several errors are assigned as grounds for reversal of the judgment. First, it is alleged that the prisoner was absent when two of the jurors were elected. It appears that ten jurors had been elected and the panel was exhausted; thereupon, the judge ordered other jurors to be summoned, and prisoner was removed from within the bar to the prisoner's dock within the court room, to await the sheriff's return of the additional panel of jurors. While the prisoner was in the

dock, two jurors who had failed to appear on the call of the first panel came into the court room, and were passed by the attorney-general and accepted by defendant's counsel. During this time the prisoner, as stated by affidavit of one of his counsel, was handcuffed and in his dock, a distance of forty or fifty feet from the jury box, but took his seat by his counsel about the time the last of the two jurors was accepted by his counsel.

The record shows that this dock or prisoner's bench is about thirty feet from the judge's stand, and in full view of the whole court and jury, and defendant was in position to see and hear all that was done, and no objection made by defendant's counsel, they having exhausted nineteen challenges. We think the prisoner was in fact and in contemplation of law, present at this proceeding, and had the opportunity to have interposed objection to either juror, if he had desired to do so.

A prisoner should not, during his trial, be manacled or handcuffed; but should be left free from shackles, unless some such restraint should be necessary to prevent escape. In this case ·the proceedings had been temporarily suspended, to allow the sheriff time to summon additional jurors, and he removed the prisoner to the dock in the rear of the court room, and there handcuffed him, no doubt to prevent escape. While there, the two jurors appeared who had failed to answer upon the first call, and were passed by the attorney-general and accepted by prisoner's counsel, before he had returned to the side of his counsel—the

last one being accepted by them about the time the
prisoner seated himself by his counsel—and half an
hour before the jury was sworn, affording ample time
for objection, and all that occurred being at the time
within the view and hearing of the prisoner. It was
only intended he should be fettered during the sus-
pension of proceedings, in making up the jury. But
by inadvertence the jurors were accepted by his coun-
sel before he took his seat beside them. This is not
is conflict with the humane spirit of the law that re-
quires a prisoner to be unfettered during his trial.

It is also objected that the jury were separated in
returning from their room in the court house to the
court room to render their verdict. In fact eleven
of the twelve came into the court room in charge of
one officer, a few yards ahead of the twelfth man,
who was in charge of another officer, and there was
no such separation as to vitiate the verdict.

It is also insisted that the court erred in admit-
ting the confessions of the prisoner. It appears that
Coleman, on whose farm prisoner lived at the time of
the homicide, and who was present when the remains
of the deceased were found, and to whom Bettie Hicks
had narrated the facts of the killing, and Davis, chief
of police, and another policeman and a reporter, went
to the station house. Prisoner said, in answer to
Coleman's question, that he did not know what he
was in prison for, and asked him to get him out.
Coleman replied, you are here for murdering Essick
Polk. Prisoner said he knew nothing about it. Cole-
man said Bettie Hicks has told us all about it, when

and where you killed him, how you cut him to pieces,. and where you buried him, and we have found the body and buried it. Prisoner seemed excited and said he had trouble in his family and had killed him, but. gave no details.

Kennedy, a newspaper reporter, states that Capt. Davis stated to Matthews about what Coleman had testified he had told him, and "that you had better tell us all about it—an honest confession is good for the soul." Thereupon his Honor, the judge, interposed and said, "that puts an end to the confession." The attorney-general insisted the witness was mistaken in attributing that language to Capt. Davis, and asking that he might retire for the present and refresh his recollection by an examination of notes he had made at the time of the conversation. This was allowed by the court; the witness then had a coversation with Capt. Davis in presence of the court, and remained in court, hearing Capt. Davis' testimony, who was examined. On being recalled he said, "He may have been mistaken in what he said Capt. Davis had .said, and he was satisfied Capt. Davis' statement was the correct one.

When the witnesses were sworn and before the trial began, the court asked the defendant if he wished the witnesses placed under the rule; and his counsel replied that the " white witnesses " might remain in the court room. So there is nothing in the exception that Kennedy heard Davis' testimony. Nor is it reversible error, that one witness was discharged for a time, after a partial examination, and another substi-

tuted. It is not said what particular point was discussed between the witnesses in the presence of the court, and although these proceedings were somewhat irregular and unusual, nothing is disclosed, which we can see operated injuriously to the prisoner, and we cannot hold the rulings of the court in respect to these matters to be erroneous.

Capt. Davis testified as to what was said, substantially the same as stated by Coleman, and adds, they were about to leave the prisoner, and he saw he was about to confess, as he renewed the conversation, when the witness said to him " an honest confession is good for the soul," but he is positive he did not say " it would be better to tell us all about it." O'Haver, who was present, is also very positive that Davis did not say "you had better tell us all about it," or anything of the kind. Both Davis and O'Haver were police officers and state they were very careful to hear and remember all that was said. Under these circumstances the judge allowed the confessions to be given in evidence.

The material inquiry, upon the question of the admissibility of confessions is, whether they have been obtained by the influence of hope or fear, applied by a third person, to the prisoner's mind: 1 Gr. Ev. sec. 219.

If the prisoner should conclude, without a promise of some temporal benefit, that it would be better for him to confess, such confession would be admissible.

It is difficult to see, in anything which transpired at the time the confession in this case was made, that

any promise or intimation of temporal benefit was held out as an inducement to confess. The language employed by Davis, that "an honest confession is good for the soul," is not a promise of temporal benefit or discharge from punishment for the crime charged, nor does it render the confession inadmissible: 1 Gr. Ev., sec. 229. So the statement that Bettie Hicks had told about the murder and that the body had been found was in fact true, and not a threat, to extort a confession.

Probably those facts made known to the prisoner, may have induced him to confess, under a strong sense of guilt and the conviction that his crime had been detected and exposed. But it cannot be said that they amounted to a promise of benefit, or threat of injury.

It is also insisted that Bettie Hicks, the only eyewitness of the homicide, has been impeached as a witness. One of the impeaching witnesses was herself impeached, and as to the other two, although they gave the name of the street on which they lived in Memphis, a policeman was unable to find any one who knew them. Bettie Hicks denies any acquaintance with them, and witnesses sustain her character. Upon a proper charge, the jury gave her credit.

We are of opinion, therefore, that there is no error in the record for which the judgment should be reversed, and it will be affirmed.