Terrell WALKER, Petitioner, Appellant,

v.

Frederick BUTTERWORTH et al., Respondents, Appellees.

No. 78–1448.

United States Court of Appeals, First Circuit.

Argued March 14, 1979.

Decided June 7, 1979.

Stephen L. Saltonstall and Eric D. Blumenson, Boston, Mass., with whom Norman S. Zalkind, Boston, Mass., was on brief, for petitioner, appellant.

Robert S. Potters, Asst. Atty. Gen., Crim. Div., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief, Crim. Bureau, Boston, Mass., were on brief, for respondents, appellees.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

PETTINE, District Judge.

This appeal of a dismissal of a petition for a writ of habeas corpus, 28 U.S.C. § 2254, requires the Court to inspect the constitutional validity of evidentiary and procedural rules traditionally practiced at criminal trials in Massachusetts.

At the state court trial, the defendant, Terrell Walker, was convicted of armed robbery and first degree murder; he was found to have successfully organized, with two others, the robbery of the Suffolk Loan Company, during the course of which he shot and killed a policeman stationed therein. The government's evidence pictured Walker as the leader by showing that he dictated which store was to be robbed, supplied one partner with a weapon and instructed him in its use, arranged for the other partner to drive the getaway car, directed which jewelry display cases to open, arranged the eventual escape and admonished them not to flee prematurely.

Walker did not deny any of this. Instead, he pleaded insanity and introduced evidence both expert and lay, as to his mental condition at the time of the crime. Two doctors testified that examinations of Walker revealed a paranoid character disorder and that on the date of the homicide he was not able to conform his conduct to the

---

* Of the District of Rhode Island, sitting by designation.

law and unable to appreciate the wrongfulness of his act.

The government did not contradict the defendant's medical testimony. Instead, to prove his sanity circumstantially, it relied on the lay evidence showing Walker's calculated organization of the robbery. In addition it leaned heavily upon the "presumption of sanity", a judicially created presumption that carries evidentiary weight in Massachusetts.

Walker appealed his conviction to the Massachusetts Supreme Judicial Court; the court rejected his numerous assignments of error. *Commonwealth v. Walker,* 370 Mass. 548, 350 N.E.2d 678 (1976). Walker then renewed his objections in this habeas corpus petition to the federal district court. Chief Judge Caffrey agreed with much of the reasoning of the Supreme Judicial Court and denied the petition. It is this denial that is now before this court.[1]

The defendant argues as errors, the trial judge's instructions as to the "presumption of sanity" and two procedures employed in the trial as ordered by the court, i. e., that defendant personally exercise his peremptory challenges and not sit at counsel table but be confined in the "prisoner's dock" throughout the trial.

The judge followed Massachusetts practice and required defendant to exercise his peremptory challenges personally after consulting with his lawyer. Defendant's lawyer, noting that sanity was the critical issue in this case, objected to this practice. It further developed that during his closing argument, the prosecutor, in what was later described as unprofessional conduct, highlighted Walker's personal exercise of the peremptory challenges and utilized them as evidence of Walker's sanity.

Ask yourself about this particular defendant. What do you think? Do you think he knew what he was doing when he stood up there and said, "I am content with this juror? I am content with this juror? I am content with this juror?"

Do you think he knew what he was doing then?

Walker's attorney also objected to this prosecutorial tactic and requested a specific cautionary instruction which was not granted. Instead, the trial judge informed the jury that the petitioner was required to make the challenges and gave a generalized instruction which noted that either lawyer's arguments were not to be considered as evidence.

Defendant's counsel likewise objected when the trial judge confined Walker to the prisoner's dock. Massachusetts practice allows a judge to utilize his discretion as to this practice and, in the present case, the court apparently required its use as it had done in all first degree murder trials. The prisoner's dock is described as being about four feet square and four feet high, open at the top so that the defendant's head and shoulders can be seen by the jury. The lawyer may freely go to the box to consult with his client.

Finally, Walker's counsel also objected to various portions of the lengthy jury charge.

■ At the outset of the charge, the trial judge attempted to explain to the jurors why the defendant had taken exceptions to evidentiary rulings during the trial, although the government had not. In explaining that the defendant had the right to except to a ruling in order to preserve the point for appeal, the judge noted that only the defendant had a right to an appeal; this jury instruction was accompanied by cautionary language demanding that the jury's verdict be free of surmise, conjecture, bias, or hostility. As the Massachusetts Supreme Judicial Court suggested, such mention of the appellate mechanics is unwise. *Commonwealth v. Walker,* 350 N.E.2d 678, 687 (1976). However, the language and context of this particular instruction evidences an intent to protect the defendant from any jury confusion or hostility that may have been aroused by the frequent

---

1. The petitioner renewed all his present claims at each appellate stage. Both sides agree that exhaustion is not an issue in this case.

taking of exceptions. Such an instruction is not unduly prejudicial and is not an error of constitutional magnitude. *See Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

The judge began his discussion of the sanity issue by describing the conclusive effect of the "presumption of sanity" when the defendant fails to make sanity an issue.[2] These comments were merely introductory and, when taken in context, might be considered superfluous, but not unduly prejudicial. *Cupp v. Naughten, supra.*

The judge then emphasized that the jury must "consider and look at the whole evidence regarding the mental condition of the defendant." In this vein, the judge noted that the expert testimony was valuable evidence but that the medical opinions were not binding upon the jury; as the "sole judges of the credibility and weight of all evidence on the issue of insanity", the jury "may believe, but is not compelled to believe, any . . . testimony or opinion given by an expert". The jury was also told that "[i]n assessing a defendant's mental responsibility for crime, the jury should weigh the fact that a great majority of men are sane and the probability that any particular man is sane". In applying this "presumption of sanity" to the present case, the judge reiterated "it is for the jury to determine whether or not the fact that a great majority of men are sane and the probability that any particular man is sane may be deemed to outweigh the evidential value of any expert testimony that [a person] is insane". As to the burden of persuasion on this issue, the trial judge repeatedly noted

that the Commonwealth had the burden of proving Walker legally sane beyond a reasonable doubt.

Aside from the two superfluous instructions already addressed, Walker concedes that the judge's jury instruction and trial procedures fully complied with traditional Massachusetts practice and procedure. The petitioner, however, argues that the well established Massachusetts "presumption of sanity" relieves the state of its constitutional burden of proving defendant's sanity beyond a reasonable doubt. *See Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). Defendant also asserts that confinement in the "prisoner's dock" during the trial erodes a defendant's presumption of innocence. Walker finally argues that the forced personal exercise of his peremptory challenges reflected upon his sanity and violated his fifth amendment privilege against self-incrimination. We find this last contention sufficiently persuasive to require a granting of this habeas corpus petition.

*The Presumption of Sanity*

Exactly what constitutes a presumption is a troubling question. In an attempt to describe presumptions, commentators have likened these evidentiary creatures to "bursting bubbles"[3] and to "bats of the law flitting in the twilight".[4] These analogies may be more colorful than illuminating. Surveying the law of presumption, Dean McCormick noted that the "use of the term presumption is only confusing". McCormick, Evidence § 346, at 830 (1972). *See*

---

2. The "presumption of sanity" does place the burden of production, or burden of "going forward" with the evidence, upon the defendant. Thus, the defendant must raise the issue of insanity by introducing some supporting evidence. If defendant fails to raise the issue, he is conclusively presumed sane. The defendant in this case does not challenge this particular aspect of the presumption. Defendant contests the effect that the presumption has on the government's burden of persuasion once the issue of sanity is properly raised.

3. *See* J. Thayer, A Preliminary Treatise on Evidence at Common Law, 313–52 (1898).

4. 9 Wigmore, Evidence § 2491. *See also* Bohlen, The Effect of Rebuttable Presumptions of Law Upon the Burden of Proof, 68 U.Pa.L.Rev. 307, 314 (1920) where presumptions are described: "Like Maeterlinck's male bee, having functioned they disappear." Judges have also discussed, and sometimes confused, the law of presumptions. Referring to the law of presumptions, Learned Hand complained: "Judges have mixed it up until nobody can tell what on earth it means. . . ." 18 ALI Proceedings 217–18 (1941).

*also* Hecht & Pinzler, Rebutting Presumptions: Order out of Chaos, 58 B.U.L.Rev. 527 (1978).

Heeding Dean McCormick's warning, the Massachusetts Supreme Judicial Court, in a recent decision, carefully defined the operation of the "presumption of sanity". *Commonwealth v. Kostka,* 370 Mass. 516, 350 N.E.2d 444 (1976). Massachusetts courts have long held that once sanity is an issue the burden of proof rests upon the Commonwealth to prove sanity beyond a reasonable doubt. *Commonwealth v. Smith,* 357 Mass. 168, 258 N.E.2d 13 (1970). The judicially created "presumption of sanity", however, aids the Commonwealth in meeting this burden because the jury is always instructed to consider the presumption of sanity when weighing the evidence. Thus, Massachusetts adopts a minority position in that the "presumption of sanity" always remains, carrying "evidential value", and may never be kept from the jury by introducing evidence of insanity. *Commonwealth v. Kostka, supra,* at 453. This definition of the "presumption of sanity" allows the Commonwealth to rely upon the presumption "to meet its burden even in a case where there is uncontradicted expert testimony that the defendant was insane at the time he committed the crime in question." *Id.* at 451.

Instructing the jury to weigh this presumption necessarily lessens the government's burden of proof. The use of this evidentiary device can be viewed as artificially aiding the government in satisfying its burden of production or as diluting the standard of "beyond a reasonable doubt". Either way, the standard of proof has been altered by a judicially created mechanism.

The United States Supreme Court has often scrutinized presumptions that operate in such an evidentiary fashion.

The Supreme Court has set down certain due process guidelines that must be met when a fact is to be presumed by a jury. In *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court held that a statutory presumption was arbitrary and unconstitutional "unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend". *Id.* at 36, 89 S.Ct. at 1548. *See also Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

In light of the Court's pronouncement in *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), that the due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime . . .", the Supreme Court has suggested that a presumption that supplies "[a] fact necessary to constitute the crime" must meet the reasonable doubt standard. Thus, *Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973), set forth a dual standard: "if a statutory inference submitted to the jury as sufficient to support conviction satisfies the reasonable-doubt standard (that is, the evidence necessary to invoke the inference is sufficient for a rational juror to find the inferred fact beyond a reasonable doubt) as well as the more-likely-than-not standard, then it clearly accords with due process." *Id.* at 843, 93 S.Ct. at 2361.[5]

**5.** In dismissing Walker's appeal the Massachusetts Supreme Judicial Court stressed that the "presumption" itself was not evidence, *Commonwealth v. Walker,* 350 N.E.2d 678, 700 (1976); rather, the jury was to "weigh the facts underlying the presumption and the inferences that may follow from [the] facts . . . ." *Commonwealth v. Kostka,* 350 N.E.2d 444, 454 (1976). Whether the "presumption of sanity" is an inference or a presumption or a creature possessing "characteristics of both presumptions and inferences", *id.* at 454, makes no constitutional difference. The Supreme Court

has chosen to scrutinize presumptions and inferences identically if they operate to shift the burden of production and are to be given evidentiary weight by a jury in criminal cases. *See Barnes v. United States,* 412 U.S. 837, 841–45, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973).

The *Barnes* case concerned the traditional common law inference that knowledge necessary for conviction may be drawn from the unexplained possession of recently stolen goods. As with the statutory presumptions involved in *Leary* and *Turner,* this "inference" operated to shift the burden of producing re-

Despite the evidentiary effect of the Massachusetts "presumption of sanity" and the Supreme Court's careful review of presumptions in criminal cases, the particular presumption in this case need not meet the standards set forth in such cases as *Turner* and *Barnes.*

■ The due process clause only requires that a state prove the essential elements of the crime charged. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). If the presumption concerns a fact ancillary to the crime, such as an affirmative defense, there is no constitutional reason to demand that the logic giving rise to the presumption meet a certain due process or burden-of-proof standard. The Supreme Court underscored this point in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). The Court emphasized that the earlier holding of *Mullaney v. Wilbur, supra,* still stood:

> *Mullaney* surely held that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense. This is true even though the State's practice, as in Maine, had been traditionally to the contrary. Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause.

*Patterson v. New York,* 432 U.S. at 215, 97 S.Ct. at 2330. In *Patterson,* however, the Court upheld a New York law designating insanity as an affirmative defense. The Court reasoned that sanity was not an essential ingredient of murder; a person could intentionally kill another person, "an act which it is not disputed the State may constitutionally criminalize and punish", without being completely sane. *Id.* at 209, 97 S.Ct. at 2326. Nor had the New York legislature deemed sanity so important to make it an ingredient that must be proven by the government. Instead, once the fundamental ingredients of the crime exist, the legislature may choose "to recognize a factor [*i. e.,* insanity] that mitigates the degree of criminality or punishment" and place the burden of raising and proving this mitigating factor upon the defendant. *Id.* Thus, the government's burden of proof and any presumptions that may affect that burden are only constitutionally relevant if they relate to an indispensable "ingredient" of the crime or an ancillary ingredient that the legislature has directed the government to prove.

■ *Patterson* holds that sanity is not an essential, constitutional ingredient of the crime of murder. Nor has the Massachusetts legislature deemed sanity sufficiently important to statutorily designate it as an element of murder to be proven by the government beyond a reasonable doubt.[6]

butting evidence onto the defendant. All three of the above cases are similar to the present case in that the jury was clearly instructed that they were permitted, but not required to find the presumed fact.

The Supreme Court made no distinction between the *Barnes* common law "inference" and a statutory presumption. In fact, the Court appeared to use the two terms interchangeably.

**6.** The requirement that the government prove sanity beyond a reasonable doubt is a judicial doctrine. *See e. g., Commonwealth v. Johnson,* 188 Mass. 382, 74 N.E. 939 (1905). This standard must be considered in context with another long-established judicial doctrine, the "presumption of sanity". Even if one finds that the presumption reduces the government's burden of proof on the issue of sanity to something less

than "beyond a reasonable doubt", the burden of proof is strictly a judicially created standard in Massachusetts.

This is not a case where the legislature has balanced competing concerns and designated sanity as an element (or ingredient) of the crime, only to have a state court dilute that standard by creating an evidentiary presumption. *Patterson* primarily was concerned with allowing the legislative branch sufficient leeway to define mitigating factors that affect criminality. 432 U.S. at 210, 97 S.Ct. 2319. That decision does not authorize judicial modification of a legislature's evidentiary standard. Once the legislature designates a fact to be proven "beyond a reasonable doubt" by the government, an expectation is created and the fact must be proven in accord with the legisla-

In fact, the Massachusetts Supreme Judicial Court, in an opinion foreshadowing the reasoning of *Patterson,* held that sanity is not an element of the Massachusetts crime of murder. *Commonwealth v. Kostka, supra,* at 455. The Massachusetts court stated: "We do not believe that a defendant's mental disease or defect . . . bears any 'necessary relationship to the existence or nonexistence of the required mental elements of the crime [charged].' *Mullaney v. Wilbur,* 421 U.S. 684, 706, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (Rehnquist, J., concurring)." *Id.* at 455 n.15. Because neither the federal constitution nor Massachusetts law make sanity an ingredient of the crime of murder, the burden of proof on the issue of sanity and the effect that the Massachusetts "presumption of sanity" has on that burden do not raise constitutional questions. We must agree with the conclusion of the Massachusetts Supreme Judicial Court:

> If sanity were an "element" of the crime charged, then recent Supreme Court cases on the use of presumptions and inferences to establish an element of the offense would be apposite to our inquiry. Because sanity is not an element of the crime charged, we do not think that cases like *Barnes v. United States,* 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *Turner v. United States,* 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); and *Leary v. United States,* 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), which concerned the use of statutory and common law inferences to establish an element of the crime charged, set forth the appropriate test.

*Id.* at 455–56. *See also Commonwealth v. Walker, supra* at 700.

## The Prisoner Dock

■ Petitioner claims that his confinement to the prisoner dock unconstitutionally eroded his presumption of innocence in the eyes of the jury. Confinement in the prisoner dock is analogized to the wearing of prison garb during trial, a practice held unconstitutional in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126, *reh.*

*den.,* 426 U.S. 954, 96 S.Ct. 3182, 49 L.Ed.2d 1194 (1976). Petitioner argues that confinement in the prisoner dock served as a "constant reminder of the accused's condition . . . [that] may affect a juror's judgment . . . [and] is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504–05, 96 S.Ct. at 1693.

The practice of isolating the accused in a four foot high box very well may affect a juror's objectivity. Confinement in a prisoner dock focuses attention on the accused and may create the impression that he is somehow different or dangerous. By treating the accused in this distinctive manner, a juror may be influenced throughout the trial. The impression created may well erode the presumption of innocence that every person is to enjoy. Of course, "[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Id.* at 504, 96 S.Ct. at 1693.

We see no state policy sufficiently compelling or essential to justify risking a dilution in the accused's presumption of innocence.

The Massachusetts courts and the federal district court found that this traditional practice of prisoner dock confinement served such state purposes as: identification of the accused person to the jury; minimizing the danger of harm to the public, court, and jury; and encouraging maintenance of courtroom order.

From the record in this case, we cannot determine whether the practice of the prisoner dock realistically promoted the interests of safety or courtroom order. In any event, the use of a dock is hardly the most advanced or least restrictive means of insuring courtroom order and protection. This is not a case where the prisoner exhibited any dangerous and disruptive propensities at trial. *See Illinois v. Allen,* 397 U.S.

---

tive standard and due process. 432 U.S. at 215, 97 S.Ct. 2319. When the legislature is silent,

however, traditional judicial evidentiary standards are controlling.

337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Further, argument that the dock helped identify the accused is hardly persuasive. Prison clothing served identification purposes in *Estelle v. Williams, supra* ; yet, the Supreme Court found this to provide no justification for the practice. The defendant can be easily identified without using the dock. Thus, even if the state's purposes are rational on an abstract level, the use of a prisoner dock may not further those interests significantly.

We must agree with District Judge Caffrey in terming the prisoner's dock "an anachronism in a modern criminal trial which could have been abandoned years ago". *Walker v. Butterworth,* 457 F.Supp. 1233 at 1239 (D.Mass.1978). The right to a fair trial is simply too delicate and valuable a right to be impeded by an anachronistic practice. Because confinement in the prisoner dock is unnecessary to accomplish any important state interest and may well dilute the presumption of innocence, the Massachusetts prisoner dock must be considered, as a general matter, to be an unconstitutional practice.

The record is unclear as to whether this unconstitutional practice constituted harmful error in this case. Determining harmless error in such a case is always difficult because "[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined." *Estelle v. Williams,* 425 U.S. at 504, 96 S.Ct. at 1693. It is true that the record reveals no evidence of prejudicial references to the defendant's confinement; yet, this is no guarantee that the jurors failed to be influenced by the prisoner dock. In such a situation, the objective record may often prove unenlightening, but a court should be ready to vindicate constitutional rights whenever an "unacceptable risk" is presented. *Id.* at 505, 96 S.Ct. 1691. Because we find other grounds upon which to grant this petition, however, we need not decide, from the rather bare record before us, whether the use of the prisoner dock produced a likelihood of harmful error in this case.[7]

*Personal Exercise of Peremptory Challenges*

■ The trial judge, in keeping with traditional Massachusetts practice in a murder case, required Walker to personally exercise his peremptory challenges. Walker was allowed to consult with his attorney about each prospective juror but he was required, in the presence of each individual juror, to announce his decision personally. After the prosecutor emphasized petitioner's ability to make such peremptory challenges personally, the trial judge's charge did inform the jury that such personal challenges were required.

Both the Massachusetts Supreme Judicial Court and the federal district court criticized the prosecutor's conduct as ill advised but rejected petitioner's contention that the required personal exercise of his challenges violated his privilege against self-incrimination.

These courts reasoned that the petitioner's peremptory challenges may have been probative as to his competency at the time of trial; but this forced communication was found to have little if any relation to the central issue of petitioner's sanity at the time of the offense.[8] The federal district court also analogized petitioner's conduct to

---

7. Judge Bownes would find reversible constitutional error in the use of the prisoner dock. Judge Coffin shares the writer's concerns about the serious constitutional questions raised by the use of the prisoner dock in this case but would reserve decision on the issue until such time as it is necessary for the disposition of an appeal. Accordingly, Judge Coffin does not join in the portion of the opinion dealing with the prisoner's dock.

8. As both courts noted, the Massachusetts Supreme Judicial Court had used similar reasoning in rejecting a nearly identical self-incrimination claim at a much earlier date. *Commonwealth v. Millen,* 289 Mass. 441, 194 N.E. 463 cert. denied, 295 U.S. 765, 55 S.Ct. 924, 79 L.Ed. 1706 (1935). The *Millen* case was decided long before *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) applied fifth amendment principles to the states. Thus, *Millen* should carry little, if any, precedential weight in a claim based upon the federal constitution.

physical actions which possessed no testimonial or communicative content.

We cannot accept this reasoning. In a case where sanity is the sole issue, the court's requirement that the petitioner personally exercise his peremptory challenges and the prosecution's subsequent emphasis on the conscious and knowing exercise of those challenges combined to violate petitioner's constitutional privilege against self-incrimination.

 There is no dispute that Walker was required, against his will and over his attorney's objection, to announce his objection or contentment as to each individual juror in front of that juror. Of course, the fact that the accused is forced to utter words does not, in itself, constitute self-incrimination. Recordings of an accused's voice are permissible if they are "used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said". *United States v. Dionisio,* 410 U.S. 1, 7, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973). Likewise, requiring the uttering of words in a lineup, for purposes of identification rather than as a way of eliciting testimony, does not violate the privilege against self-incrimination. *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Nor has the fifth amendment ever prohibited the government from requiring the accused to supply some form of incriminating evidence. In *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court allowed the government to introduce an incriminating blood sample involuntarily taken from the defendant. The Supreme Court noted that a distinction had emerged in the law of self-incrimination: "the privilege is a bar against compelling 'communications' or 'tes-

timony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Id.* at 764, 86 S.Ct. at 1832.

The critical question, for the purposes of the self-incrimination clause, is whether the forced utterances had communicative content. One can safely start with the premise that Walker's statements of objection or satisfaction were not typical testimony in the sense of narrating an occurrence or confessing guilt. The concept of verbal communication, however, is not limited to narration or direct confessions of guilt. Rather, verbal communication is the use of words to impart or transmit information. Walker's comments constitute such verbal communication.

 Walker obviously was communicating his satisfaction with the individual jurors. More importantly, these forced words revealed Walker's mental process of evaluating each juror. In exercising these challenges, Walker was transmitting, against his will, an important message to the jury. Roughly translated, this message would read: "the accused can rationally and sanely communicate with his lawyer and make important trial decisions."[9] Each juror was not measuring Walker's words for their "physical properties", *United States v. Dionisio, supra,* and the words were not being used for their identifying characteristics, *United States v. Wade, supra.* Taken in isolation, the words "I am content with this juror" mean little. But, in the context of an insanity defense, the words necessarily take on an additional meaning and relate important and incriminating information. The content of the words and the mental processes that they necessarily embodied and revealed, conveyed an inescapable mes-

**9.** Of course, this transmitted message might be completely erroneous. Forcing one to exercise his peremptory challenges personally may well produce a dangerously incorrect impression of sanity precisely because the person is not communicating with entire independence and under his own free will. The likelihood that the message transmitted may be erroneous argues for applying the protections of the fifth amendment. Prohibiting the inherent unreliability of

forced communication is an important policy reflected in the privilege against self-incrimination. *See Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964) (the privilege reflects "our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.'").

sage to the jury. The message conveyed was directly relevant to the sole issue at trial and can be fairly defined as communication for the purposes of the privilege against self-incrimination.

Any doubts as to the communicative or testimonial nature of the peremptory challenges were resolved by the prosecutor's closing argument. The prosecutor had no doubt about the important statement that Walker's words conveyed. In highlighting the accused's personal exercise of the peremptory challenges, the prosecutor explicitly repeated the words spoken by Walker and attempted to utilize them as testimonial evidence bearing upon Walker's sanity.[10] Requiring Walker to speak and seizing upon his words as constituting evidence against him, threatened the central values of the privilege against self-incrimination:

> [T]he constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. *Chambers v. Florida,* 309 U.S. 227, 235–238, 60 S.Ct. 472, 476–477, 84 L.Ed. 716 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

*Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

Forcing one to exercise his peremptory challenges personally is hardly comparable to the practices of the Star Chamber. In the context of an insanity defense, however, the uttering of peremptory challenges reveals damaging inferences. In capitalizing upon Walker's utterances, the prosecutor was not producing evidence by his own independent labors but relying upon the simple expedient of compelling testimony from the accused. Walker simply was not provided the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

The present case is a far cry from cases holding that no fifth amendment violation exists when a court orders psychiatric examination of defendants pleading insanity. The legal arguments and theoretical justifications that support compelled psychiatric examination are completely inapplicable to this case. In a psychiatric examination, a neutral expert analyzes the defendant's statements, dreams and actions; the psychiatrist then correlates this information to medical postulates and issues a report. Although such an examination often requires compelled communication from the defendant, the courts find the resulting psychiatric analysis sufficiently neutral and buffered by expertise to equate it with the medical examination of physical characteristics upheld in *Schmerber, supra. See, e. g., United States v. Baird,* 414 F.2d 700 (2d Cir. 1969). These courts recognize that expert examination of the defendant who pleads insanity is one of the few methods of obtaining scientific, reliable evidence on the issue. *See, e. g., United States v. Bohle,* 445 F.2d 54, 66 (7th Cir. 1971); *United States v. Handy,* 454 F.2d 885 (5th Cir. 1971). Even though compelled communication is in-

---

**10.** In this case we are concerned with how the prosecutor's argument reinforced and aggravated the court's infringement upon the accused's privilege against self-incrimination. We do not find *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) directly relevant. *Donnelly* concerns the degree of prosecutorial misconduct necessary to constitute a violation of general due process protections. Because we find that a specific constitutional guarantee was implicated in this case, the standard set forth in *Donnelly* is not applicable.

volved, the psychiatric examinations are constitutionally permissible because the "great importance of expert testimony on the issue of insanity" outweighs "the minimal risk to the Fifth Amendment privilege." *United States v. Bohle,* 445 F.2d at 66.

Compared to the rationale supporting compelled psychiatric examinations, this case presents almost the reverse situation. The prosecutor decided not to introduce any expert testimony but instead relied, in part, on the defendant's personal exercise of peremptory challenges. The forced statements in this case went directly to the jury; the lack of any expert evaluation or guidance made these statements extremely unreliable and prejudicial. Indeed, because these comments were compelled, they are not evidence of any rational decisional process; yet, to each juror the appearance of the defendant uttering these words and apparently making important trial decisions was both damaging and misleading. The prosecutor's comments exacerbated the situation. This series of events threatened one of the key purposes behind the self-incrimination clause: protection against forced, unreliable evidence. *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

This is not a situation where there is an important interest to be served by permitting reliable and expert evidence. In fact, no rational purpose supports the archaic practice of compelling a defendant to personally exercise peremptory challenges.[11] When the prosecution spurns expert testimony and relies upon compelled statements which transmit an extremely unreliable message, there is a substantial risk to the fifth amendment privilege. In light of this risk and the lack of any countervailing purpose, the constitutional balance is struck differently than in such cases as *Bohle, supra.* When sanity is an issue, the practice of requiring and allowing comment on the personal exercise of peremptory challenges

unconstitutionally infringes the accused's privilege against self-incrimination.

This constitutional violation cannot be overlooked by asserting that Walker's utterances were only probative of his competency at the time of trial. Almost inevitably, evidence of defendant's current mental abilities carried inferential weight as to his past mental condition. The actual impact of the defendant's utterances on the jury cannot be measured. The prosecutor certainly recognized that demonstrating sanity at the time of trial might well persuade the jury of the accused's sanity at the time of the crime.

The personal exercise of the peremptory challenges communicated damaging information to the jury. Even so, the Commonwealth argues, the accused's expressions or actions in the courtroom could have communicated the same information. Maybe so, but this argument misses the point. Unlike expressions or actions, the challenges were compelled. The defendant could not control the words or conceal the thought process that they revealed. This compulsion, for the purposes of the privilege against self-incrimination, makes all the difference.

We must conclude that the compelled utterances conveyed important and relevant information to the jury. The prosecutor insured that the utterances conveyed the message of the accused's sanity; the sanity of the accused was the sole issue at trial. In the context of this case, such a combination of occurrences violated Walker's privilege against self-incrimination and denied him a fair trial. The trial judge's well intentioned, but highly generalized, charge could not adequately remedy the constitutional violation.

Recognizing that the privilege against self-incrimination is an essential mainstay of our adversary system and a hallmark of our society, we reverse.

The writ of habeas corpus shall issue unless the Commonwealth makes arrangements for a new trial within ninety days.

---

11. Unlike a guilty plea, where personal communication is helpful to show full comprehension and voluntariness, the exercising of peremptory challenges does not necessitate complete comprehension by the accused or his personal participation.