COMMONWEALTH vs. ALBERT FRANCIS MOORE, JR.

Essex.  May 7, 1979. — August 29, 1979.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Constitutional Law*, Prisoner's dock.  *Due Process of Law*, Prisoner's
dock.  *Practice, Criminal*, Location of defendant in court room, Se-
curity measures in court room.  *Evidence*, Polygraphic test, Tracking
by dog, Reputation, State of mind, Relevancy and materiality.  *Wit-
ness*, Impeachment.

A judge confronted with a request that the defendant in a criminal case be
    permitted to sit at counsel table should not deny the request unless he
    follows the procedure prescribed for unusual security measures in
    *Commonwealth v. Brown*, 364 Mass. 471 (1973). [107-111]
In the circumstances, the defendant in a criminal case was not prejudiced
    by the judge's refusal to allow him to sit at counsel table during trial.
    [111]
The judge at a criminal trial did not abuse his discretion in excluding
    evidence of a polygraph test of a prosecution witness, offered to im-
    peach the witness.  [111-114]
At a criminal trial, the judge did not err in permitting a police officer
    trained as a dog handler to describe the track followed by a trained
    dog after the dog was given a scent from the defendant's shirt.
    [114-115]
There was no merit to a criminal defendant's contention that the judge
    erred in various evidentiary rulings and that the defendant was preju-
    diced by the cumulative effect of the rulings. [115-116]

INDICTMENT found and returned in the Superior Court on
January 19, 1976.

The case was tried before *Ronan*, J.

*Margaret Hayman* for the defendant.

*Dyanne Klein Polatin*, Assistant District Attorney, for the
Commonwealth.

BRAUCHER, J.  The defendant appeals from his conviction
of murder in the first degree, and assigns as error the judge's

refusal to allow him to sit at counsel table during trial. He also asserts error in the judge's refusal to allow impeachment of a prosecution witness by means of a polygraph test, and he argues a number of other evidentiary issues. We affirm the conviction.

The crime was committed in August, 1972. The defendant was indicted in January, 1976, and tried the following June. More than thirty-five witnesses testified at the trial, which lasted two and one-half weeks. The verdict of guilty was returned June 18, 1976.

We briefly summarize the evidence. The victim was a part owner and construction supervisor of a condominium project in Salem, and was found dead in his townhouse at the site shortly after 8:30 A.M. on August 14, 1972. His skull had been fractured by repeated blows with a blunt instrument, and death could have occurred at any time between 11 P.M. on August 13 and 8 A.M. the following morning. There were no signs of forced entry.

The defendant was a foreman at the project, and had a master key to the project buildings. There was antagonism between him and the victim. Four witnesses testified that the defendant had admitted the killing, and three of them described in detail the circumstances of the murder as told by the defendant.

The defendant testified in his own behalf. He admitted that he was at the project for a short time during the early morning hours of August 14, but denied killing the victim. He explained that he went to the project from his wife's home in Newton, New Hampshire, to exchange a truck for a rental car, so that his wife could use it for a trip on August 14. He stopped briefly at the company's cottage in Danvers, drove the car home, stayed there a short time, and reported for work about 7 A.M. After giving out work assignments, he again left the site. He testified that he first learned of the victim's death when he returned to work about 8:30 that morning.

1. *The prisoner's dock.* At a pretrial conference defense counsel agreed to the prosecutor's request that the investi-

gating detective sit at counsel table. He then requested that
the judge allow the defendant to sit at counsel table, ex-
plaining that the defendant had a hearing problem and that
it was critical to have quick access to his client. He con-
tinued: "Also, and I know there is no basis that I know of in
law for this, but there has always been something that has
bothered me about that prisoner's dock, the effect that it has
on the jury psychologically seeing a man in that enclosure."
The judge noted that the court room had an amplification
system, and said, "I will make some inquiry from the sheriff
to see, because the Sheriff has, of course, the responsibility
of security, so I will make some inquiry with reference to
your request to have him sit next to you. That depends on
security." The results of the inquiry and the reasons for de-
nying defense counsel's request do not appear in the record,
but there is no dispute that the defendant sat in the dock
during the trial. During trial the prosecutor referred to
"[t]he man sitting in this wooden enclosure," and the judge
instructed the jury that "[w]here the defendant sits is a mat-
ter of custom like so many other things, [and] has no conse-
quence."

Most court rooms used for criminal sessions in the Com-
monwealth are equipped with a dock, a wooden enclosure,
usually measuring four or five feet square, in which it has
long been customary for the defendant to sit during trial.
The dock is open at the top, so that the upper torso of a
seated person is visible. The judge, the court clerk, court
officers and the jury occupy similar enclosures, the arrange-
ment of which varies from court room to court room. The
dock as we know it appears to be a vestige of the English
baledock: "[A] small room taken from one of the corners of
the court, and left open at the top; in which, during the
trials, are put some of the malefactors." See *Illinois* v.
*Allen*, 397 U.S. 337, 355 n.3 (1970) (separate opinion of
Douglas, J.).

There are few reported cases in other jurisdictions con-
cerning the use of docks. Placement of defendants in the
dock, "as was the English custom," was preferred to the

use of more extreme measures such as "gyves" and shackles in *State* v. *Kring*, 1 Mo. App. 438, 443 (1876), aff'd, 64 Mo. 591 (1877). In *State* v. *Kupis*, 37 Del. 27, 29 (Ct. of Oyer & Terminer 1935), the defendant's request to sit with counsel rather than in the prisoner's dock was said to be "contrary to the well settled practice in this state." See also *McCullough* v. *State*, 40 Ala. App. 309, 312-313 & n.1, cert. denied, 269 Ala. 698 (1959), and cases cited; *Matthews* v. *State*, 77 Tenn. 128, 130-131 (1882); Annots., 5 A.L.R.3d 1360, 1389-1390 (1966), 23 A.L.R. 1382, 1391-1393 (1923). In *Commonwealth* v. *Boyd*, 246 Pa. 529, 534 (1914), the court said that the defendant had a right to sit with counsel upon request, notwithstanding the general custom of placing the accused in the dock to secure an orderly trial. But the error was held harmless because it was "impossible for a mind not disturbed by excessive zeal to see in what respect the defendant was prejudiced." *Id.* at 534-535.

We have often held that it is within the judge's sound discretion whether to grant a defendant's request to sit at counsel table or elsewhere. *Commonwealth* v. *Walker*, 370 Mass. 548, 573-574, cert. denied, 429 U.S. 943 (1976). *Commonwealth* v. *MacDonald (No. 2)*, 368 Mass. 403, 408-409 (1975). *Commonwealth* v. *Bumpus*, 362 Mass. 672, 680 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974). *Commonwealth* v. *Jones*, 362 Mass. 497, 500-501 (1972). Cf. *Guerin* v. *Commonwealth*, 339 Mass. 731, 733-735 (1959) (right to communicate with counsel); *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 81 (1978) (request to sit with family); *Commonwealth* v. *Magnasco*, 4 Mass. App. Ct. 144, 148 (1976). The practice varies from judge to judge and depends largely on the circumstances of the individual case. In view of a recent opinion of the United States Court of Appeals for the First Circuit we think the use of the dock must be reconsidered. See *Commonwealth* v. *Campbell*, 378 Mass. 680, 697 n.14 (1979).

In *Walker* v. *Butterworth*, 599 F.2d 1074, 1080-1084 (1st Cir. 1979), the court ordered that a writ of habeas corpus issue because the trial judge had required the defendant to exercise his peremptory challenges personally rather than through counsel, where his sanity was the sole issue. The opinion also discussed the prisoner's dock and concluded, "[b]ecause confinement in the prisoner dock is unnecessary to accomplish any important state interest and may well dilute the presumption of innocence, the Massachusetts prisoner dock must be considered, as a general matter, to be an unconstitutional practice." *Id.* at 1081. One judge would have found reversible constitutional error on this point, a second thought it unnecessary to decide "whether the use of the prisoner dock produced a likelihood of harmful error in this case" (*id.*); and the third did not join in the portion of the opinion dealing with the dock because it was unnecessary for disposition of the appeal. We of course give respectful consideration to persuasive decisions of the Federal courts. See *Commonwealth* v. *Masskow*, 362 Mass. 662, 667 (1972). There is force in the characterization of the dock as an "anachronism" by the United States District Court judge in the *Walker* case. *Walker* v. *Butterworth*, 457 F.Supp. 1233, 1239 (D. Mass. 1978). See ABA Standards Relating to Trial by Jury, Commentary to § 4.1 (a) at 92 (1968). Ordinarily, a criminal defendant should be permitted to sit at counsel table. But the dock has served and may continue to serve a valid function in those cases where some form of restraint is necessary to prevent escape or to protect others in the court room. Although the restraint imposed is minor, it has sometimes proved a sufficient obstacle so that court officers could reach the defendant in time to prevent escape or harm to others. Where some form of security is essential, the dock seems far superior to surrounding the defendant with security personnel. Cf. *Dorman* v. *United States*, 435 F.2d 385, 396-398 (D.C. Cir. 1970) (marshal seated behind each defendant); *United States ex rel. Ford* v. *New Jersey*, 400 F.Supp. 587, 593 (D.N.J. 1975) (defendant seated behind counsel beside a guard). Where

the defendant must be shackled, the dock conceals that fact from the jury and minimizes possible prejudice.

For the future, we think that a judge confronted with a request that the defendant be permitted to sit at counsel table should not deny the request unless he follows the "more circumspect procedure" we have prescribed for unusual security measures. See *Commonwealth* v. *Brown*, 364 Mass. 471, 478-480 (1973). In particular, the reasons for the denial should be stated on the record. But where inquiry reveals that some security measures are necessary, and that the dock is the least restrictive measure available, we think its use is proper.

In the present case, the defendant did not sharply raise a constitutional objection. Although it would have been better for the judge to state on the record his reasons for seating the defendant in the dock, it is evident that the judge was concerned with security. It is unclear from the record whether there were less restrictive measures to preserve security. If there was error, we are unable to discover any risk of prejudice. Defense counsel was able to consult with the defendant throughout the trial, and no question of identification arose that might render the defendant's relative isolation in the dock unduly suggestive. Cf. *Commonwealth* v. *Napolitano*, 378 Mass. 599, 603-604 (1979). Furthermore, the judge gave timely and forceful instructions to the jury to draw no inference from the fact that the defendant was in the dock, explaining that it was only a matter of custom. His later charge on the presumption of innocence was thorough. Those instructions were sufficient to extinguish any remote possibility that the jury might have been prejudiced by the use of the dock.

2. *Polygraph evidence.* The defendant claims error in the exclusion of evidence of a polygraph test, offered to impeach a prosecution witness. Bransky, a prosecution witness, testified to damaging admissions made by the defendant shortly before and after the murder. He also testified that originally he had repeatedly told the police he knew nothing about the murder, and that he first gave them

information consistent with his trial testimony in June, 1975, after promises of immunity from prosecution. The judge excluded evidence that a polygraph test administered by the police on August 28, 1972, showed a truthful response when the witness denied having conversations with the defendant regarding the murder.

Shortly after the murder, as part of their investigation, State police conducted polygraph examinations of the defendant, the witness Bransky, and at least three other workers at the condominium project. At a pretrial conference, defense counsel moved for production of the test results, saying that "all these people took those tests at their risk, waiving whatever rights they had at that time." The prosecutor said he had given defense counsel all copies of test results that he had, and indicated that the report on Bransky showed a truthful response. During the trial the judge ruled that the matter was one of discretion, that he would permit witnesses to testify to statements by the defendant that he "beat" a polygraph test, and that he would allow in evidence the fact that the defendant took such a test on August 14, 1972, and whatever results were shown, but that he would not permit reference to polygraph tests taken by other witnesses. The polygraph examiner was unavailable at trial because of illness; the parties entered into a stipulation relating to the defendant's test, but it was never offered in evidence. The only polygraph question before us relates to the exclusion of evidence as to the test given to Bransky.

We have dealt with evidence of polygraph tests taken by criminal defendants in several cases. *Commonwealth* v. *Allen*, 377 Mass. 674, 675-678 (1979). *Commonwealth* v. *Moynihan*, 376 Mass. 468, 477-479 (1978). *Commonwealth* v. *Vitello*, 376 Mass. 426, 427-457 (1978). *Commonwealth* v. *A Juvenile (No. 1)*, 370 Mass. 450, 452-454 (1976). *Commonwealth* v. *Howard*, 367 Mass. 569, 570-573 (1975). *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 423-433 (1974). See *Commonwealth* v. *Patterson*, 4 Mass. App. Ct. 70, 76-78 (1976). Our cases dealing with polygraph tests administered to other witnesses, however, shed little light

on the question whether evidence of such tests can ever be used to impeach or corroborate the testimony of the witness, since we have found it unnecessary to decide that question. See *Commonwealth* v. *Stewart*, 375 Mass. 380, 383-385 (1978); *Commonwealth* v. *Chase*, 372 Mass. 736, 751-752 (1977); *Commonwealth* v. *Patterson*, *supra*.

Decisions in other jurisdictions disclose differences of opinion similar to the differences over the use of a defendant's polygraph test. See *Commonwealth* v. *Vitello*, 376 Mass. 426, 447-450 (1978) (collecting cases); 3A J. Wigmore, Evidence § 999 & n.2 (Chadbourn rev. 1970 & Supp. 1979). Reversible error has been found in a number of cases where the results of a polygraph test were disclosed to corroborate a prosecution witness. See, e.g., *Dean* v. *State*, 325 So.2d 14, 17-19 (Fla. Dist. Ct. App. 1975) (evidence volunteered on cross-examination); *State* v. *Davis*, 351 So.2d 771, 772-774 (La. 1977) (same plus exploration on redirect examination); *Mattox* v. *State*, 240 Miss. 544, 555-561 (1961) (redirect examination); *Fulton* v. *State*, 541 P.2d 871, 872-873 (Okla. Crim. App. 1975) (rebuttal by State). In some such cases it has been suggested that the evidence might be admissible if there were a stipulation by the defendant. See, e.g., *State* v. *Kilpatrick*, 2 Kan. App. 2d 349, 350-351 (1978); *State* v. *Roberts*, 547 S.W.2d 500, 501 (Mo. Ct. App. 1977); *State* v. *LaForest*, 106 N.H. 159, 161 (1965) (motion for new trial); *State* v. *Stanislawski*, 62 Wis.2d 730, 736-745 (1974). In *State* v. *Taylor*, 139 N.J. Super. 301, 304-306 (1976), a key witness took the test pursuant to stipulation, and it was held that the defendant had waived the rule that limits corroboration to cases where recent fabrication is charged. In a few cases convictions have been affirmed, on a variety of grounds, after the admission on behalf of the prosecution of evidence of a witness's polygraph test. *Herlong* v. *State*, 236 Ga. 326, 328-329 (1976) ("admissible to explain the conduct of the officers" in obtaining a warrant). *Swan* v. *State*, 268 Ind. 317, 322-323 (1978) (no timely objection). *State* v. *McDonough*, 350 A.2d 556, 562-563 (Me. 1976) (evidence elicited by defendant).

Defendants have not had much success in offering the results of unsuccessful polygraph tests to impeach prosecution witnesses. See, e.g., *State* v. *Christopher*, 149 N.J. Super. 269, 273-276 (1977) (need explicit stipulation by State); *State* v. *Young*, 87 Wash. 2d 129, 130-132 (1976) (reliability insufficient in absence of stipulation). In *People* v. *Barbara*, 400 Mich. 352, 411-416 (1977), however, the court held that polygraph results could be used, in the discretion of the judge, to bolster the testimony of a new witness on a motion for a new trial. In *State* v. *Stanislawski*, 62 Wis. 2d 730, 743-745 (1974), the court held that the testimony of the complaining witness in a rape case could be impeached by results of polygraph tests administered by written stipulation. And in *United States* v. *Hart*, 344 F.Supp. 522, 523-524 (E.D.N.Y. 1971), where a mistrial had been declared because the prosecution had failed to disclose that its principal witness had failed a polygraph test, the court admitted the polygraph results in evidence at the new trial.

In this situation we think it the part of wisdom to reserve again the question whether evidence of a polygraph test is ever admissible to impeach a prosecution witness. Assuming, without deciding, that it may be, we think the matter must rest largely in the discretion of the trial judge, and we find no abuse of discretion here. We do not rely on the absence of a stipulation, since the witness took the test voluntarily at the instance of the Commonwealth, and the examiner was chosen by the Commonwealth. But the witness was only one of a number of potential prosecution witnesses who had taken polygraph tests; his testimony was no more crucial than that of several other witnesses; and the danger of diversion and confusion may well have outweighed any probative value. Moreover, there was no showing or offer of proof that the test, in the circumstances, was reliable.

3. *Evidence of tracking by dog.* Over the defendant's objection, a police officer trained as a dog handler was permitted to describe the track followed by a trained dog through the condominium project after the dog was given a scent from the defendant's shirt. There was no error. *Com-*

*monwealth* v. *LePage*, 352 Mass. 403, 418-419 (1967). After an extensive voir dire, the judge found the evidence to be reliable. See Annot., 18 A.L.R.3d 1221 (1968 & Supp. 1978).

4. *Other evidentiary issues.* The defendant also argues that the prejudice due to the cumulative effect of five other evidentiary rulings, claimed to be erroneous, requires reversal. Each of the alleged errors seems inconsequential, and they do not seem to reinforce each other. But we are unable to find any error at all.

(1) The ex-wife of a prosecution witness was called by the defendant to impeach the witness through evidence of his reputation for veracity. She had moved out of the community seven years before the trial, but had continued to teach school there and had maintained business and social contacts there. The judge excluded her testimony because her knowledge of her ex-husband's reputation was too attenuated. There was no abuse of discretion. *Commonwealth* v. *Belton*, 352 Mass. 263, 269, cert. denied, 389 U.S. 872 (1967).

(2) A friend of the defendant's wife testified over objection to a conversation between the defendant and his wife with reference to washing or burning his clothes. The witness could not remember any response by the defendant, and was unsure which person mentioned burning. The evidence was offered to show the defendant's state of mind, and was not hearsay. *Commonwealth* v. *Fiore*, 364 Mass. 819, 824 (1974). Its relevance to the defendant's movements after the murder outweighed any potential prejudice. *Commonwealth* v. *Cruz*, 373 Mass. 676, 692 (1977).

(3) Bransky testified that he and the defendant stole a stove from the project some three months after the murder. Taken by itself, this evidence was remote, but there was other evidence that the defendant had admitted stealing appliances from the project and that he thought the victim knew it. The evidence was relevant to show motive. *Commonwealth* v. *Brown*, 376 Mass. 156, 164-165 (1978). Its remoteness was a matter for the discretion of the judge. See *Commonwealth* v. *Pickles*, 364 Mass. 395, 400 (1973).

(4) Officer McNulty testified to a conversation with the defendant in which McNulty made clear accusations and was met with equivocal replies. At the close of the conversation, he testified, he told the defendant he would "get" him but would not lie; he would "play the game straight." The defendant failed to object to those statements at the time, and no error is presented for review. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967). Moreover, the statements, though not material, were part of a conversation otherwise admissible, and they were cumulative and corroborative rather than prejudicial.

(5) There was testimony that the defendant made derogatory statements about the victim in August, 1975, three years after the murder. Those statements were part of what amounted to a confession by the defendant, and the defendant's contention that they were too remote in time is frivolous.

5. *Section 33E*. Pursuant to G. L. c. 278, § 33E, we have examined the entire record, and have found no reason to disturb the conviction.

*Judgment affirmed.*