**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 13, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 13, 2024

*E. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 101828-2 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| CASSANDRA LEE LUTHI, | ) | |
| | ) | Filed: June 13, 2024 |
| Appellant. | ) | |
| | ) | |

YU, J. — This case asks whether a criminal defendant may be required to appear for nonjury proceedings from an "in-court holding cell"[1] without an individualized inquiry justifying such a restraint. The answer is no. The in-court holding cell undermines the presumption of innocence, interferes with a defendant's ability to communicate with counsel, and violates the dignity of the

---

[1] The parties refer to this structure differently: appellant Cassandra Luthi calls it a "cage," while the State calls it a "booth." Appellant's Opening Br. at 1; Resp't's Br. at 1. Based on the photographs and descriptions provided by both parties, we refer to it as an "in-court holding cell."

defendant and the judicial proceedings. Therefore, absent an individualized finding that such a restraint is necessary to protect "essential state interests such as physical security, escape prevention, or courtroom decorum," the routine use of this in-court holding cell violates federal and state constitutional due process protections against "'inherently prejudicial'" courtroom practices. *Deck v. Missouri*, 544 U.S. 622, 628, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 569, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)); *see also* U.S. CONST. amend. XIV; WASH. CONST. art. I, § 22; *State v. Jackson*, 195 Wn.2d 841, 852-53, 467 P.3d 97 (2020).

Appellant Cassandra Luthi was required to appear for a nonjury hearing from an in-court holding cell at the Cowlitz County Jail courtroom. Despite Luthi's timely objections, the superior court did not conduct an individualized inquiry to determine whether such a restraint was justified, believing that it was unnecessary to do so. We hold that an individualized inquiry was required. The State fails to show this error was harmless. Therefore, we reverse the superior court, grant Luthi's requested relief, and remand for a new hearing.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.   The Cowlitz County Jail courtroom holding cell

In order to fully appreciate the particular restraint at issue in this case, we must first describe the in-court holding cell at the Cowlitz County Jail courtroom

that was used for Luthi's hearing.  The parties do not dispute what the in-court holding cell looks like or the circumstances in which it is used.

The Cowlitz County Superior Court often employs a courtroom in the Cowlitz County Jail for short criminal proceedings without witnesses.  When the defendant appears for such a hearing, they enter the in-court holding cell directly from a "secured area of the jail."  Resp't's Br. at 1.

The holding cell appears to be located at the back or side of the Cowlitz County Jail courtroom, away from the table where counsel sits.  The interior of the holding cell is roughly five feet wide, five feet deep, and eight feet long, with a "mesh window" on the right to allow defendants to speak with their attorneys, and a glass window on the left.  *Id.* (internal quotation marks omitted).  Viewed from the courtroom, the in-court holding cell looks like this:



*Id.* at 2.

There is "[n]o recording device near [the] [d]efendant" inside the holding cell, although there is a small slit at the bottom of the mesh window to exchange paper work. Verbatim Rep. of Proc. (VRP) (Feb. 3, 2023) at 14. There is also a chair or stool in the holding cell where the defendant may sit, but it is disputed whether a seated defendant can still easily view and participate in the proceedings. A corrections officer is typically inside the holding cell with the defendant during proceedings, and defendants are typically not shackled or handcuffed. There is no indication that Luthi's hearing differed from the typical case.

B.     Luthi's appearance from the in-court holding cell

In 2021, Luthi pleaded guilty to delivery of heroin within a school zone and was given a mental health sentencing alternative (MHSA)[2] of 36 months' community custody. Following two violation notices from Luthi's community corrections officer in 2022, the State petitioned to revoke the MHSA. Luthi was taken into custody at the Cowlitz County Jail on December 20, 2022, where she was held without bail until her MHSA revocation hearing in February 2023.

Luthi's defense counsel was already "very familiar" with the in-court holding cell, which counsel refers to as "a cage on the side of the [Cowlitz County Jail] courtroom." Clerk's Papers (CP) at 27. According to defense counsel, the in-court holding cell was a "dehumanizing" restraint comparable to shackling, which

---

[2] RCW 9.94A.695.

4

could not be imposed "absent evident necessity determined on an individualized basis by the court." *Id.* at 27, 31. Through counsel, Luthi filed a motion before her MHSA revocation hearing "to appear in court without restraints," arguing that "[t]here [was] no reason to place Ms. Luthi inside of a cage and for her to be physically separated from the court proceedings" because she was "not a flight risk, [and] she [was] not going to harm herself or others." *Id.* at 25, 34.

The superior court did not decide Luthi's motion before she was required to appear in court. As a result, Luthi appeared at the February hearing from the in-court holding cell, with a corrections officer standing next to her. Luthi again objected to the use of the "cage" at her hearing, and the superior court orally denied her motion. VRP (Feb. 3, 2023) at 9-10. The superior court explained that the in-court holding cell was not "the same" or "at the same level as shackling," and that the court did not "really see any prejudice to Ms. Luthi." *Id.* at 9. The superior court did not conduct an individualized inquiry to determine whether Luthi presented any courtroom security concerns.

Luthi admitted the two violations. She asked for time served and to be released so that she could continue with her treatment as directed by her MHSA. Luthi also personally made a statement to the court but because the in-court holding cell had no recording device, several sections of the transcript are marked "inaudible" and "indiscernible." *Id.* at 14-15. It appears that Luthi attempted to

5

convey her struggles with mental illness and substance abuse, and her desire to follow the treatment as directed.

After her hearing, Luthi wrote an e-mail to defense counsel, explaining how difficult it was to participate from the in-court holding cell because it was "almost impossible to speak" to her attorney. CP at 46. Luthi also described feeling as though she was "on display" in the holding cell and "not a part of [her] own court hearing." *Id.*

The superior court amended Luthi's sentence to impose a 45-day sanction for time served. We granted direct review and now reverse.

## ISSUES

A.    Was the superior court required to conduct an individualized inquiry to determine whether courtroom security concerns made it necessary for Luthi to attend her MHSA revocation hearing from the in-court holding cell?

B.    If an individualized inquiry was required, is Luthi entitled to a new hearing?

## ANALYSIS

A.    The superior court was required to conduct an individualized inquiry before requiring Luthi to appear for her hearing from the in-court holding cell

It is undisputed that Luthi was compelled to attend her MHSA revocation hearing from the in-court holding cell and that the superior court declined to conduct an individualized inquiry into whether this restraint was justified for

6

security reasons. The State urges this court to affirm, arguing that the in-court holding cell does not implicate the due process right "'to appear at trial free from all bonds or shackles except in extraordinary circumstances.'" *Jackson*, 195 Wn.2d at 852 (quoting *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999) (plurality opinion)). Alternatively, the State argues that these due process protections do not apply to Luthi's hearing because it was not a trial and there was no jury. The State is incorrect on both points. We reverse the superior court and hold that Luthi was entitled to an individualized inquiry before she could be required to appear from the in-court holding cell.

1.      Due process requires an individualized inquiry before any defendant may be restrained at any court appearance

To provide context for the in-court holding cell used in this case, it is first necessary to review existing constitutional protections against the use of unjustified restraints on criminal defendants.

A defendant's right to appear in court free from unjustified restraints is well established as a matter of federal and state due process law.[3] *Deck*, 544 U.S. at 626; *Jackson*, 195 Wn.2d at 852. Long-standing precedent holds that a defendant cannot be physically restrained at trial "unless some impelling necessity demands the restraint." *State v. Williams*, 18 Wash. 47, 51, 50 P. 580 (1897); *see also State*

---

[3] The parties have not briefed, and we do not consider, whether our state constitution provides heightened due process protections in this context.

7

*v. Damon*, 144 Wn.2d 686, 690-91, 25 P.3d 418 (2001). The same protections apply to capital penalty proceedings and nonjury pretrial hearings. *Deck*, 544 U.S. at 630; *Jackson*, 195 Wn.2d at 852, 854. Therefore, "[a] trial court must engage in an individualized inquiry into the use of restraints prior to every court appearance" to determine whether the restraints are necessary for courtroom security. *Jackson*, 195 Wn.2d at 854 (emphasis omitted).

Restraints are "'disfavor[ed]'" because placing restrictions on a defendant's "mental and physical faculties" when they appear in court "'may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial.'"[4] *Id.* at 852 (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)). Thus, to determine whether a particular type of restraint implicates a defendant's due process rights, we must consider the effect of the restraint on the fairness of the proceedings.

Much of the case law in this area arises from the practice of shackling, due to its roots in the United States from slavery and its historical use on incarcerated

---

[4] Luthi's claim is based on the due process right to appear in court without unjustified restraints rather than the right to counsel during critical stages of the proceedings. *See* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Heddrick*, 166 Wn.2d 898, 909, 215 P.3d 201 (2009). Although the right to consult with counsel is relevant to the due process inquiry, we need not, and do not, address whether Luthi's MHSA revocation hearing was a critical stage of the proceedings and, thus, structural error. *See State v. Heng*, 2 Wn.3d 384, 389, 539 P.3d 13 (2023).

persons. *Id.* at 850-51. Compelling a defendant to appear for court in visible shackles provides "unmistakable indications of the need to separate a defendant from the community at large," implying "that [the defendant] is particularly dangerous or culpable." *Holbrook*, 475 U.S. at 569. In this way, shackles "undermine[ ] the presumption of innocence and the related fairness of the factfinding process." *Deck*, 544 U.S. at 630. Thus, we have long held that a defendant cannot be shackled at trial absent an individualized inquiry to determine whether "'extraordinary circumstances'" require "measures that implicate courtroom security, including whether to restrain a defendant in some capacity in order to prevent injury." *Jackson*, 195 Wn.2d at 852 (quoting *Finch*, 137 Wn.2d at 842); *see also Williams*, 18 Wash. 47.

Although the right to appear free from unjustified restraint arises most often in shackling cases, federal and state courts have recognized that other courtroom practices may implicate due process as well. For example, the United States Supreme Court has held that "compelling [a defendant] to wear jail clothing" violates due process because it "furthers no essential state policy" and creates "an unacceptable risk . . . of impermissible factors coming into play." *Estelle v. Williams*, 425 U.S. 501, 505, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). Similarly, the First Circuit Court of Appeals has held that confining a defendant to a "prisoner's dock" at trial is "inconsistent with the presumption of innocence."

*Young v. Callahan*, 700 F.2d 32, 36 (1st Cir. 1983); *see also Walker v.*

*Butterworth*, 599 F.2d 1074, 1081 (1st Cir. 1979).[5]  Therefore, "the prisoner's

dock, like other physical restraints" may be imposed only if the trial court finds

that it is necessary to maintain security in the courtroom.  *Young*, 700 F.2d at 36.

This court has also extended the due process right to appear free from

unjustified restraints beyond the practice of shackling.  For instance, we have held

that conducting a trial in a jailhouse courtroom "present[s] an unacceptable risk of

impermissible factors" that a jury "'might reasonably draw'" from that practice.

*State v. Jaime*, 168 Wn.2d 857, 861-62, 233 P.3d 554 (2010) (quoting *Holbrook*,

475 U.S. at 569).  Therefore, "as with shackling, trial courts are obligated to

undertake a careful analysis of the facts of the situation to determine whether the

extraordinary measure [of holding a jury trial in a jailhouse] is warranted."  *Id.* at

865.

In addition, the due process right to appear without unjustified restraints is

not limited to jury trials.  To the contrary, the United States Supreme Court has

recognized that the same protections apply in the penalty phase of a capital case,

---

[5] The "prisoner's dock" at issue in *Young* was a "'box approximately four feet square and four feet high,'" and "'open at the top so that the defendant's head and shoulders can be seen when [they are] seated. . . . The dock is usually fifteen to twenty feet behind counsel table, and is sometimes on a raised platform.'"  700 F.2d at 33 n.1 (quoting *Walker v. Butterworth*, 457 F. Supp. 1233, 1238 (D. Mass. 1978), *rev'd*, 599 F.2d 1074 (1st Cir. 1979)).

and this court subsequently applied these protections to nonjury pretrial hearings. *Deck*, 544 U.S. at 630; *Jackson*, 195 Wn.2d at 852.

First, the Supreme Court recognized that "shackles at the penalty phase threaten" the presumption of innocence, even though the jury has already decided the question of guilt, because the decision to impose capital punishment "is no less important." *Deck*, 544 U.S. at 632. Indeed, compelling a defendant to appear in shackles for *any* phase of a trial "almost inevitably affects adversely the jury's perception of the character of the defendant" by implying "that court authorities consider the offender a danger to the community." *Id.* at 633. As a result, "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding" and must instead exercise discretion "to take account of special circumstances, including security concerns, that may call for shackling" on a "case specific" basis. *Id.*

In *Jackson*, this court recognized that we must "extend the trial protections against blanket shackling policies to pretrial proceedings as well." 195 Wn.2d at 852. In that case, the trial court "adopted" the sheriff's office "policies on the restraint and shackling of in-custody defendants appearing in court." *Id.* at 846. These policies required every defendant to be shackled for every court appearance, including all nonjury hearings, without any individualized determination that such restraint was justified. *Id.* at 847. Yet, the State argued that this "systemic and

routine shackling of incarcerated persons without an individualized inquiry" was constitutionally permissible because "restrictions on the use of visible shackles applies only at trial and capital penalty proceedings." *Id.* at 844, 853.

We unanimously rejected the State's argument, holding "that the constitutional right to a fair trial is also implicated by shackling and restraints at nonjury pretrial hearings" due, in part, to the racist history of shackling and "the unknown risks of prejudice from implicit bias and how it may impair decision-making." *Id.* at 852, 856 (footnote omitted). *Jackson* recognized that "the right to be free from restraint is not absolute, and trial court judges are vested with the discretion to determine measures that implicate courtroom security." *Id.* at 852. However, such discretion must be exercised on an individualized basis, and the trial court's decision "'must be founded upon a factual basis set forth in the record.'" *Id.* at 853 (quoting *Hartzog*, 96 Wn.2d at 400). Therefore, adopting a general policy for shackling all detained defendants without individual justification was "a failure by the [trial] court to exercise its discretion" and a violation of the defendant's constitutional due process rights. *Id.* at 854.

Our analysis in *Jackson* was based, in part, on the fact that courtroom restraints implicate numerous constitutional rights in addition to the presumption of innocence, such as "'testifying in one's own behalf, and [the] right to consult with counsel.'" *Id.* at 852 (quoting *Hartzog*, 96 Wn.2d at 398). Indeed, "one of

the defendant's primary advantages of being present at the trial, [their] ability to communicate with [their] counsel, is greatly reduced when the defendant is in a condition of total physical restraint." *Illinois v. Allen*, 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). Unjustified restraints also "offend[ ] the dignity of the judicial process" and "undermine [the] symbolic yet concrete objectives" of courtroom dignity and decorum, "which includes the respectful treatment of defendants." *Finch*, 137 Wn.2d at 845; *Deck*, 544 U.S. at 631.

Thus, to resolve the issues presented in Luthi's case, we must determine whether the in-court holding cell at the Cowlitz County Jail courtroom implicates due process protections against unjustified restraints and whether these protections apply at a nonjury MHSA revocation hearing. The answer is yes.

2. The in-court holding cell implicates Luthi's due process right to appear at all courtroom proceedings without unjustified restraints

We have not previously considered the due process implications of routinely confining defendants to an in-court holding cell for nonjury hearings. However, it is apparent that the in-court holding cell at the Cowlitz County Jail courtroom is a restraint on defendants that undermines the presumption of innocence, the ability to consult with counsel, and the dignity of the proceedings. Contrary to the State's arguments, these concerns do not vanish when a jury is not present. Therefore, the superior court may not impose a blanket policy requiring defendants to appear for

13

any type of hearing from the in-court holding cell, absent an individualized inquiry justifying the use of such restraint.

Most importantly, the in-court holding cell clearly undermines the presumption of innocence. Beyond merely indicating "the need to separate a defendant from the community at large," the in-court holding cell imposes a physical separation between the defendant and everyone else in the courtroom. *Holbrook*, 475 U.S. at 569. Applying "reason, principle, and common human experience," we must conclude that this "constant reminder of the accused's condition" could invite any decision-maker to draw negative, prejudicial inferences, even at a subconscious level. *Estelle*, 425 U.S. at 504. As Luthi explained, this was precisely what she experienced when she was required to appear from the in-court holding cell without justification: "I feel as if the audience looks at me as if I must be guilty because I am behind the bars." CP at 46.

Nevertheless, the State contends the in-court holding cell could not erode the presumption of innocence because "Luthi did not appear before a jury being presumed innocent of the charges." Resp't's Br. at 8. This argument is foreclosed by controlling precedent. As discussed above, the due process right to appear without unjustified restraints applies to *every* court appearance, including "nonjury pretrial hearings." *Jackson*, 195 Wn.2d at 852. Regardless of whether the

decision-maker is a judge or a jury, they may be "unconsciously prejudiced by the restraints at any point during the case." *Id.* at 856.

Moreover, contrary to the State's suggestion, Luthi was not presumed guilty at her MHSA revocation hearing. The State bore the burden to prove the alleged violations had occurred, and Luthi had a due process right to hold the State to its burden. *Cf. State v. McCormick*, 166 Wn.2d 689, 700, 213 P.3d 32 (2009) (holding due process rights are implicated in special sex offender sentencing alternative[6] revocation hearings). Given "the unknown risks of prejudice from implicit bias and how it may impair decision-making," the in-court holding cell clearly eroded Luthi's presumption of innocence at her MHSA revocation hearing. *Jackson*, 195 Wn.2d at 856 (footnote omitted).

Additionally, like other courtroom restraints implicating due process, the in-court holding cell imposed significant limitations on Luthi's ability to communicate with her defense counsel. *See Deck*, 544 U.S. at 630-31. At the hearing, it was "almost impossible" for Luthi to speak to counsel, because she was attempting to communicate "through glass," with a corrections officer standing right next to her. CP at 46. It cannot be disputed that the presence of a guard in a five-by-five-foot holding cell would discourage any defendant from discussing confidential matters relevant to their case with counsel. Communication is further

---

[6] RCW 9.94A.670.

limited because defense counsel cannot stand next to their client and must pass all paper work through a small slit in the wall of the holding cell.

Finally, the in-court holding cell is contrary to "[t]he courtroom's formal dignity, which includes the respectful treatment of defendants." *Deck*, 544 U.S. at 631. In the United States, defendants traditionally sit next to their counsel at counsel table, and courtrooms have historically been built without docks or in-court holding cells. David Tait, *Glass Cages in the Dock?: Presenting the Defendant to the Jury*, 86 CHI.-KENT L. REV. 467, 468, 472 (2011). Compelling a defendant to appear from an in-court holding cell without justification creates the perception that "the rest of the courtroom [is] really a theater . . . making the defendant an exhibit or spectacle in the trial." *Id.* at 475. As Luthi articulated, "I feel as if I am on display and not a part of my own court hearing, as if I am not a part of the discussion but being talked about. . . . It's difficult to feel included when I am separated from all parties." CP at 46.

Thus, the in-court holding cell at the Cowlitz County Jail courtroom raises the same due process concerns as other courtroom restraints, and controlling precedent recognizes that a defendant is entitled to due process at every courtroom appearance, not just jury trials. We decline the State's invitation to carve out an exception for the practices at issue in this case. Therefore, we reject the routine practice of requiring defendants to appear from an in-court holding cell where

16

there has been no individualized finding that such restraint is necessary for courtroom security reasons.[7]

Here, the superior court did not engage in an individualized inquiry before requiring Luthi appear from the in-court holding cell for her hearing, believing it was unnecessary to do so. As discussed above, an individualized inquiry was required. Moreover, there is no indication that the added restraint of an in-court holding cell was needed, given that Luthi was already confined within the Cowlitz County Jail. Courtroom security measures are generally "vested within the discretion of the trial court," but in this case, "the court's failure to exercise discretion constitutes constitutional error." *Jackson*, 195 Wn.2d at 850, 854.

B.     The State has not met its burden to show that the error was harmless

Because Luthi's constitutional due process rights were violated at her MHSA revocation hearing, she is entitled to her requested remedy of a new hearing unless the State meets its burden to show the error was harmless. *Id.* at 855-56. The State fails to meaningfully address the harmless error standard, offering only perfunctory arguments that do not satisfy its burden.

---

[7] Although we do not categorically prohibit the use of this in-court holding cell, there may be a question as to whether any set of circumstances exists to justify its use. Restraints may be imposed to ensure courtroom security, but it is difficult to see how the extreme prejudice created by the in-court holding cell could be outweighed by security concerns, given that (1) the courtroom is already located within a secure jail facility and (2) courts "must consider less restrictive alternatives before imposing physical restraints." *Finch*, 137 Wn.2d at 850.

17

First, the State argues that the unjustified use of the in-court holding cell at Luthi's MHSA revocation hearing was harmless because there was no jury. Resp't's Br. at 12. As discussed above, this argument is foreclosed by precedent holding that "the constitutional right to a fair trial is also implicated by shackling and restraints at *nonjury* pretrial hearings." *Jackson*, 195 Wn.2d at 852 (emphasis added). The in-court holding cell was clearly visible to the superior court judge, who may have been "unconsciously prejudiced by the restraints at any point during the case." *Id.* at 856.

The State also argues the error was harmless because the courtroom for Luthi's hearing was "located within the jail building," which is, itself, a prejudicial restraint. Resp't's Br. at 12; *see Jaime*, 168 Wn.2d at 864. We reject the State's suggestion that subjecting a defendant to two prejudicial restraints at the same time somehow negates the separate harm caused by each one.

The State's arguments are insufficient to "'overcome the presumption of prejudice when a constitutional right of the defendant is violated.'" *Jackson*, 195 Wn.2d at 855 (quoting *State v. Clark*, 143 Wn.2d 731, 775, 24 P.3d 1006 (2001)). Therefore, Luthi is entitled to a new MHSA revocation hearing.

CONCLUSION

Cowlitz County Superior Court's routine practice of confining defendants to an in-court holding cell for nonjury hearings, without any individualized inquiry,

violates the constitutional right to due process. We reaffirm that trial courts *must* engage in an individualized inquiry before *every* hearing to determine whether there are extraordinary circumstances justifying courtroom restraints for security reasons. In this case, the superior court declined to conduct an individualized inquiry, and the State fails to show this constitutional error was harmless beyond a reasonable doubt. Accordingly, we reverse and remand to the superior court for a new MHSA revocation hearing.

_____
Yu, J.

WE CONCUR:

_____
González, C.J.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____

_____
Stephens, J.

_____

No. 101828-2

WHITENER, J. – I agree with the result reached by the majority but would go further to correct, and prevent, future constitutional violations such as the one here. The majority is correct that the use of the holding cell violated Cassandra Luthi's constitutional rights and that the State failed to meet its burden of proof to show that the error was harmless beyond a reasonable doubt. I part ways with the majority in that I do not agree that the individualized inquiry jurisprudence applies in this specific circumstance. Instead, I would hold that Cowlitz County's routine use of the jail courtroom holding cell, over objection, is so inherently prejudicial and repugnant to our state and federal constitutions that the practice should be prohibited. I would arrive at the same conclusion, even if an individualized inquiry was applied, because of the preexisting security measures of a jail courtroom and myriad less restrictive alternatives available. Therefore, I respectfully concur in result only.

HISTORICAL BACKGROUND

The practice of confining an accused to an enclosure within a courtroom traces its roots back to 16th century England. Steven Shepard, Comment, *Should the Criminal Defendant Be Assigned a Seat in Court?*, 115 YALE L.J. 2203, 2206 n.13 (2006); David Tait, *Glass Cages in the Dock?: Presenting the Defendant to the Jury*,

86 Chi.-Kent L. Rev. 467, 468 (2011).  These enclosures are typically called a "prisoner's dock" and can be described as a "railed pen in which [an accused] once stood during trial."  Shepard, *supra*, at 2205.  The prisoner's dock survived the Atlantic crossing and lingered in American courthouses of the Eastern Seaboard well into the 20th century.  *Id.* at 2206.  For example, in Massachusetts, "[t]he prisoner's dock is described as being about four feet square and four feet high, [and] open at the top so that the defendant's head and shoulders can be seen by the jury."  *Walker v. Butterworth*, 599 F.2d 1074, 1076 (1st Cir. 1979); *see also Commonwealth v. Moore*, 379 Mass. 106, 108, 393 N.E.2d 904 (1979) (explaining that "[m]ost court rooms used for criminal sessions in the Commonwealth are equipped with a dock").

By the end of the 19th century, most American courts stopped confining an accused to a prisoner's dock during trial.  Shepard, *supra*, at 2206.  Today, the accused sits with their lawyer at a counsel table, which is "positioned to reflect equal status with the prosecution's table."  *Id.*  Most states got rid of their prisoner's docks one courthouse at a time, without appellate litigation.  *Id.* at 2207.  This occurred as new courthouses were built or redeveloped from the late nineteenth century.  Tait, *supra*, at 472.  "The dock apparently remained in some courtrooms, to be used when required, but slowly fell into disuse, so that by the early part of the twentieth century, new courtrooms usually omitted them altogether."  *Id.* at 474.  In fact, United States federal court guidelines make no provision for docks, suggesting that they are not

used. *Id*. But some "[h]istorical courts" retain the prisoner's dock for "antiquarian purposes." *Id*.

According to one commentator, there are two principle reasons behind the abolishment of the prisoner's dock in the United States. *See* Shepard, *supra*, at 2207. First, the dock disappeared in part because the earliest American trials were held in taverns, meetinghouses, town halls, and private homes, which lacked the elaborate English furniture. *Id*. Second, the dock disappeared because "an emerging egalitarian spirit rebelled at the idea of denying the defendant the autonomy to choose [their] own seat [in the courtroom]." *Id*.

The jail courtroom holding cell in Cowlitz County is similar to the prisoner's dock in that it is a structure that confines an accused during judicial proceedings. However, there are critical differences between the traditional prisoner's dock and the jail courtroom holding cell used in Cowlitz County. Unlike the prisoner's dock used in Massachusetts courts or English courts, the holding cell here is *entirely enclosed*. Additionally, the photographs submitted by counsel show that a corrections officer stands within earshot of the defendant inside of the enclosure, eliminating any privacy between the defendant and their attorney. Furthermore, the jail courtroom holding cell here is located within a secure jail facility. In my research, I have not found any other state that uses a holding cell located within a

jail courtroom like the one in Cowlitz County. These differences are critical to the resolution of this case.

ANALYSIS

I.   AN INDIVIDUALIZED INQUIRY IS NOT NEEDED FOR COWLITZ COUNTY'S ROUTINE USE OF THE HOLDING CELL

The majority holds that due process requires an individualized inquiry into the need for the holding cell because it is akin to a prejudicial restraint. It is (arguably, its ultimate form),[1] but I disagree that an individualized inquiry is needed into its proposed use. Instead, I would hold that the holding cell is so inherently prejudicial and contrary to our state and federal constitutions that its use should be prohibited.

Historically, restraints are viewed "as an extreme measure to be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape." *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981) (citing *Illinois v. Allen*, 397 U.S. 337, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)). We view restraints with disfavor "because they may abridge important constitutional rights, including the presumption of innocence, privilege of testifying in one's own behalf, and right to consult with counsel during trial." *Id*. Restraints implicate the right to a fair trial and right to counsel announced by the Sixth and

---

[1] *See, e.g.*, *State v. Jaime*, 168 Wn.2d 857, 865-67, 233 P.3d 554 (2010) (holding that a trial in a jailhouse courtroom is akin to shackling and is therefore inherently prejudicial); *State v. Jackson*, 195 Wn.2d 841, 854, 467 P.3d 97 (2020) (holding that the right to be free from restraint extends to every court appearance, not just trial).

Fourteenth Amendments to the United States Constitution and article I, section 22

of the Washington State Constitution. *See State v. Jackson*, 195 Wn.2d 841, 852,

467 P.3d 97 (2020). To ensure these fundamental rights, we have repeatedly held

that "'a defendant in a criminal case is entitled to appear at trial free from all bonds

or shackles except in extraordinary circumstances.'" *Id*. (quoting *State v. Finch*, 137

Wn.2d 792, 842, 975 P.2d 967 (1999) (plurality opinion)). In *Jackson*, we extended

this right to be free from restraint to every court appearance. *Id*. at 854.

Certainly, the right to appear free from restraint is not absolute. "[T]rial court

judges are vested with the discretion to determine measures that implicate courtroom

security." *Id.* at 852. In fact, we have identified several factors for a trial court to

address to determine if a defendant needs to be restrained:

> "[T]he seriousness of the present charge against the defendant;
> defendant's temperament and character; his age and physical attributes;
> his past record; past escapes or attempted escapes, and evidence of a
> present plan to escape; threats to harm others or cause a disturbance;
> self-destructive tendencies; the risk of mob violence or of attempted
> revenge by others; the possibility of rescue by other offenders still at
> large; the size and mood of the audience; the nature and physical
> security of the courtroom; and the adequacy and availability of
> alternative remedies."

*Id*. at 853 (alteration in original) (internal quotation marks omitted) (quoting *State v.*

*Hutchinson*, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998), *abrogated in part on*

*other grounds by Jackson*, 195 Wn.2d at 856). When a trial court analyzes each of

these factors and decides on the need for restraints for a particular defendant, it

completes its constitutional duty to conduct an "individualized inquiry." *Id*. at 854-55.

Typically, these factors are evaluated in the context of a traditional public courtroom, where the general public is free to ingress and egress. However, the need for restraints falls by the wayside when a criminal defendant is brought into a courtroom that is located *in a county jail*. Security is already heightened at these locations: the premises are typically secured and corrections officers are in full control of those in their custody. Defendants, such as Luthi, are already restrained in the State's custody when appearing in the courtroom held within a jail. Thus, the courtroom within the jail is *already secure*, and the need for *additional* restraints—such as the jail courtroom holding cell—appear to be superfluous and a matter of jail policy. Here, the State was unable to articulate any essential state interest that the jail staff and other lesser forms of restraint could not already provide.

Precedent tells us that certain courtroom procedures that implicate the defendant's right to a fair trial and further no essential state interest can be held unconstitutional without analyzing an individual need for the procedure. In *Estelle v. Williams*, the United States Supreme Court held that compelling a defendant to wear jail clothing, over objection, during trial was so inherently prejudicial that the practice violated due process and equal protection of the laws. 425 U.S. 501, 512, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). The court reasoned in part that the practice

undermined the presumption of innocence afforded to criminal defendants under the

Fourteenth Amendment, and in doing so, noted that the individualized inquiry case

law did not apply:

> The defendant's clothing is so likely to be a continuing influence throughout the trial that, not unlike placing a jury in the custody of deputy sheriffs who were also witnesses for the prosecution, an unacceptable risk is presented of impermissible factors coming into play.
>
> That such factors cannot always be avoided is manifest in *Illinois v. Allen*, 397 U.S. 337 (1970), where we expressly recognized that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant . . . ," *id*., at 344; yet the Court upheld the practice when necessary to control a contumacious defendant. For that reason, the Court authorized removal of a disruptive defendant from the courtroom or, alternatively, binding and gagging of the accused until he agrees to conduct himself properly in the courtroom.
>
> Unlike physical restraints, permitted under *Allen*, *supra*, compelling an accused to wear jail clothing furthers no essential state policy. That it may be more convenient for jail administrators, a factor quite unlike the substantial need to impose physical restraints upon contumacious defendants, provides no justification for the practice. Indeed, the State of Texas asserts no interest whatever in maintaining this procedure.

*Id*. at 505 (citation and footnote omitted).

Here, the use of the jail courtroom holding cell is a "'brand of incarceration'"

that is inconsistent with the presumption of innocence secured by our state and

federal constitutions. *Young v. Callahan*, 700 F.2d 32, 36 (1st Cir. 1983) (quoting

ABA STANDARDS FOR CRIMINAL JUSTICE, cmt. on § 4.1(b) (1980) (discussing

prisoner's docks)). The fact that Luthi's hearing came in the context of a revocation

hearing and not a trial is inconsequential, as Luthi is entitled to the presumption of

innocence that she did not violate the terms of her mental health sentencing alternative (MHSA). Similar to jail clothing, "reason, principle, and common human experience" suggest that a judge, like a jury, is likely to draw negative, prejudicial inferences against the defendant by the sight of them in a cage. *Estelle*, 425 U.S. at 504; *Jackson*, 195 Wn.2d at 856 (explaining that the dangers of unconscious bias in decision-making exists for both judges and juries). Unlike other physical restraints, here, the use of the holding cell furthers no essential state policy that could not otherwise be achieved with less restrictive means. Accordingly, like *Estelle*, I would hold that there is absolutely no justification for this continued practice and an individualized inquiry is pointless.

The *Estelle* Court held that a defendant's failure to object to wearing jail clothing negated any constitutional violation, thus permitting the practice. 425 U.S. at 512-13. However, this portion of *Estelle* requiring objection is distinguishable and need not be followed because the record shows that the use of the jail courtroom holding cell also violated Luthi's right to counsel.

"Under both the Washington and United States Constitutions, a criminal defendant is entitled to the assistance of counsel at [all] critical stages in the litigation." *State v. Heddrick*, 166 Wn.2d 898, 909, 215 P.3d 201 (2009); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "Generally, a critical stage is one where 'a defendant's rights may be lost, defenses waived, privileges claimed or

waived, or in which the outcome of the case is otherwise substantially affected.'"

*State v. Heng*, 2 Wn.3d 384, 392, 539 P.3d 13 (2023) (internal quotation marks

omitted) (quoting *Heddrick*, 166 Wn.2d at 910). A sentencing hearing is a critical

stage of a criminal proceeding entitling a defendant the right to counsel. *State v.*

*Tinkham*, 74 Wn. App. 102, 109-10, 871 P.2d 1127 (1994); *Gardner v. Florida*, 430

U.S. 349, 358, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977).

"The constitutional right to have the assistance of counsel carries with it a

reasonable time for consultation and preparation. Consultation includes not only

assistance in trial preparation, but opportunity for private and continual discussions

between defendant and [their] attorney during the [proceedings]." *Hartzog*, 96

Wn.2d at 402 (internal citation omitted). "Where the court has reason to believe that

courtroom security will be impaired if it permits the defendant to have the customary

access to counsel, *it should explore alternatives which impinge as minimally as*

*possible on this important right*." *Id*. (emphasis added).

Here, the record shows that the holding cell hindered Luthi's ability to

communicate with her counsel privately. In a subsequent e-mail to her counsel,

Luthi explained that it was "almost impossible to speak to [her] attorney" and it was

"impossible to speak with [her attorney] without the jailer standing next to [her] to

hear since [she] is speaking to [her attorney] through glass." Clerk's Papers (CP) at

46. Indeed, the photographs submitted by Luthi in her briefing also show that a

corrections officer would stand next to a defendant in the small jail courtroom holding cell, which not only discourages confidential communications but also hinders private communications between a defendant and their counsel. The admitted photographs also show that during proceedings, counsel is prevented from standing directly next to the defendant, further limiting continual attorney-client communications. On this record, I am unable to see a circumstance where the use of the jail courtroom holding cell would not "impinge as minimally as possible" on the right to counsel, as required by our decision in *Hartzog*.

Additionally, the use of the jail courtroom holding cell also interfered with the fundamental dignity and decorum expected in a courtroom. Courtroom decorum is upheld to respect the integrity of the judicial process, the solemnity of the administration of justice, and to accord the proper respect to all participants, including the defendant. *See State v. Jaime*, 168 Wn.2d 857, 862, 233 P.3d 554 (2010). These are the "'hallmarks of all court proceedings in our country.'" *Hartzog*, 96 Wn.2d at 396 (quoting *Allen*, 397 U.S. at 343). Here, the record shows that Luthi felt alienated from her own hearing, that she felt "on display," and that she felt the audience looked at her as if she "must be guilty." CP at 46. This anecdote exemplifies that the holding cell sacrifices the dignity of the defendant in exchange for the convenience of jail staff. But the convenience for jail staff or administrators does not qualify as a compelling state interest that can be used to justify prejudicial

treatment of a defendant. *Estelle*, 425 U.S. at 505. The transcript of the hearing also shows the difficulty the transcriber had hearing the communications between Luthi and the judge's statements. Verbatim Rep. of Proc. (Feb. 3, 2023) at 14. Critically, the placement of the courtroom within a county jail runs counter to the court being perceived as "a neutral place to conduct the business of the law." *Jaime*, 168 Wn.2d at 864 (holding that conducting a trial in a jailhouse courtroom is inherently prejudicial). The jail courtroom holding cell is inherently inconsistent with traditional hallmarks of court proceedings in this country.

The majority cites to a pair of federal appellate decisions suggesting that the use of a "prisoner's dock," which is somewhat similar to the jail courtroom holding cell here, may be permissible after an individualized inquiry into its need. *Young*, 700 F.2d 32; *Walker*, 599 F.2d 1074. These cases are distinguishable. First, the use of the courtroom docks occurred in traditional courtroom settings and not one located in a jail. Second, the same security and flight concerns that govern those cases are quelled where court is held in a jail. Third, but more importantly, the prisoner's docks used in historical courtrooms of the Eastern Seaboard were not *completely enclosed*, which is far more harmful to constitutional rights and fails to pass judicial scrutiny.

It is important to note, while neither party or the majority raise this point, there is evidence of other Fourteenth Amendment violations regarding the use of a jail

11

courtroom holding cell. In *Estelle*, the Court held that requiring defendants to stand trial in jail clothing, but not requiring defendants to do so if they could post bail, is "repugnant to the concept of equal justice embodied in the Fourteenth Amendment." 425 U.S. at 505-06. Cowlitz County apparently has a policy requiring all inmates to appear in the jail courtroom holding cell for their hearings. Resp't's Br. at 1. This requirement does not appear to be required of defendants who are able to post bail. This policy inherently embodies unequal treatment of defendants based on financial ability to post bail, just as in *Estelle*. Similarly, this policy is repugnant to the concept of equal justice of the Fourteenth Amendment.

Safety concerns that govern the use of restraints are minimized when a criminal defendant is brought into a courtroom located in a county jail. The use of the jail courtroom holding cell in Cowlitz County undermines the presumption of innocence, the right to counsel, and is an affront to the decorum that courts are expected to uphold. No compelling state interest is furthered by the use of this type of restraint. Accordingly, I would hold that the individualized inquiry our jurisprudence required in these circumstances does not apply here. I would prohibit Cowlitz County from using this jail courtroom holding cell.

II.     THE HOLDING CELL WILL ALWAYS FAIL UNDER AN INDIVIDUALIZED INQUIRY ANALYSIS

I do not agree that an individualized inquiry applies here, but even if it does, my conclusion would remain the same.

12

The right to appear free from restraint is not absolute. Trial court judges are vested with the discretion to determine measures that implicate courtroom security and we have identified several factors for a trial court to address to determine if a defendant needs to be restrained. *Jackson*, 195 Wn.2d at 852-853. Namely, the "'*nature and physical security of the courtroom*[] *and the adequacy and availability of alternative remedies.*'" *Id*. at 853 (emphasis added) (quoting *Hutchinson*, 135 Wn.2d at 887-88).

This jail courtroom holding cell would always fail an individualized inquiry analysis. First, jail settings are already highly secure with multiple security personnel available for quick intervention in dangerous situations. Second, the risk of escape is effectively nonexistent because jail settings are typically "locked-down" facilities. Third, there are a plethora of less restrictive methods of protecting court participants while simultaneously allowing the defendant to be seated with counsel in order to privately communicate with them. The other less restrictive forms of restraint that are available to the court include handcuffs, stun belts, braces, additional in-court guards, more protective placement of guards within the courtroom, or even fully virtual hearings for all parties involved (which would allow defendants to participate from a separate location but still sit next to counsel). Accordingly, even assuming that Luthi presented a security or flight risk, the jail courtroom holding cell fails to pass constitutional muster because of preexisting

security measures inherent in a jail courtroom and the availability of less restrictive alternative means.

CONCLUSION

While I agree with the majority that the use of the jail courtroom holding cell violated Luthi's constitutional rights and that the State has not met its burden of proof to show that the error was harmless beyond a reasonable doubt, I would go further and hold that this practice always amounts to a *per se* violation of the state and federal constitutions. No compelling state interest is furthered by the use of a jail courtroom holding cell. I would prohibit Cowlitz County from using this jail courtroom holding cell. Accordingly, I respectfully concur in result only.

Whitener, J.

Montoya-Lewis, J.

Schubert, J.P.T.[*] (concurring)—I write separately only to highlight possible considerations when requesting remand for a new termination hearing. Prior to the February 3, 2023 mental health sentencing alternative (MHSA) termination hearing that is before this court on appeal, the Department of Corrections (DOC) recommended revocation of Ms. Luthi's MHSA sentence in its December 20, 2022 "Notice of Violation." Clerk's Papers (CP) at 21. The State joined in that request. CP at 18. To revoke a MHSA sentence, RCW 9.94A.695(11)(c) requires the reviewing court to issue written findings indicating a substantial and compelling reason. Had the reviewing court issued such findings on February 3, 2023, Ms. Luthi would have received an 88- to 144-month sentence unless, pursuant to RCW 9.94A.695(11)(c), the court also found compelling reasons to impose an exceptional sentence below that standard range or the parties agreed to a downward departure. CP at 6. Instead, given her admitted violations, Ms. Luthi achieved the most favorable outcome she could have at that hearing: credit for time served and continuation of treatment and community custody pursuant to her MHSA sentence. CP at 35-36.

Remanding this matter for a new MHSA termination hearing vacates her admission and that outcome—and requires Ms. Luthi's attendance at the new hearing.[1] On remand, the DOC will presumably again present Ms. Luthi's alleged violations of the terms of her MHSA sentence for consideration by the reviewing court. At that hearing, neither the DOC nor the State will be bound by their prior recommendations.[2] Likewise, the reviewing court will have discretion to decide the

---

[*] Judge Ken Schubert is serving as justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

[1] Prior to the termination hearing that is the subject of this appeal, Ms. Luthi spent 45 days in the Cowlitz County Jail after the police took her into custody on a warrant for allegedly violating her MHSA sentence by, among other things, failing to report. CP at 27, 36.

[2] Ms. Luthi's trial counsel submitted to the reviewing court a declaration in support of her "Motion and Memorandum for Appearance in Court Without Restraint." In that declaration, her counsel stated she conferred with Ms. Luthi's DOC case manager prior to the February 3, 2023 hearing, and he agreed to stipulate to a violation with Ms. Luthi reengaging with treatment. CP at 27. At

outcome anew. Simply put, Ms. Luthi will again face the possible revocation of her MHSA

sentence and potential imposition of an 88- to 144-month sentence at the new MHSA termination

hearing on remand, an outcome that she previously avoided.

In addition to presenting risks, a new MHSA termination hearing on remand may also be

unnecessary. Ms. Luthi is only a few months away from attending the community custody

termination hearing that RCW 9.94A.695(11) requires occur one month before the expiration of

her 36-month community custody term. CP at 7. In compliance with the majority opinion, she will

appear without restraint at that hearing, absent an individualized inquiry by the reviewing court

showing that security concerns require otherwise.

At that community custody termination hearing, RCW 9.94A.695(11) provides the

reviewing court with the following options:

> (a) Authorize the department to terminate the defendant's community
> custody status on the expiration date; or
> (b) Continue the hearing to a date before the expiration date of community
> custody, with or without modifying the conditions of community custody; or
> (c) Revoke the sentencing alternative and impose a term of total or partial
> confinement within the standard sentence range or impose an exceptional sentence
> below the standard sentencing range if compelling reasons are found by the court
> or the parties agree to the downward departure. The defendant shall receive credit
> for time served while supervised in the community against any term of total
> confinement. The court must issue written findings indicating a substantial and
> compelling reason to revoke this sentencing alternative.

Unlike the new MHSA termination hearing that will occur on remand, RCW 9.94A.695(11) does

not require that the DOC attend, present evidence of any violations, or advocate a particular

outcome at the community custody termination hearing.

---

the February 3, 2023 termination hearing, the State did not take a position and deferred to the court.
Verbatim Rep. of Proc. at 13.

Although Ms. Luthi requested a new MHSA termination hearing on appeal, the parties did not address the necessity or advisability of holding such a hearing on remand. Nor did they reference the upcoming requisite community custody termination hearing. As the majority holds, Ms. Luthi's success on appeal entitles her to the remedy she seeks. Having highlighted some issues parties may consider when requesting remand for a termination hearing, I concur in the majority decision.

_____
Schubert, J.P.T.

_____
Madsen, J.