**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>JOHN ALEXANDER MORGAN,<br><br>Appellant. | No. 58965-6-II<br>(consolidated with No. 58971-1-II<br><br><br>UNPUBLISHED OPINION |

CHE, J. — John Morgan appeals his convictions for one count of rape of a child in the first degree, one count of rape of a child in the third degree, three counts of child molestation in the first degree, two counts of child molestation in the first degree—domestic violence, and one count of child molestation in the second degree—domestic violence.[1]

Over a period of several years, Morgan sexually abused six victims. He was charged with the abuse of five of the victims in one cause number. Later, he was charged in a second cause number with the abuse of the sixth victim. Before trial, the State moved to join both cause numbers for trial. Defense counsel stipulated to the joinder, and the trial court granted the motion without further inquiry. The jury convicted Morgan on all eight counts.

---

[1] Morgan appealed his judgment and sentence under two separate cause numbers, and the cases were consolidated pursuant to RAP 3.3(a). Ruling Granting Consolidation, *State v. Morgan*, No. 58965-6-II, consolidated with No. 58971-1-II (Wash. Ct. App. Aug. 23, 2024).

No. 58965-6-II
Consol. No. 58971-1-II

At sentencing, Morgan, who was in custody, appeared virtually. The trial court did not provide Morgan with a method for communicating privately with defense counsel. The trial court imposed an exceptional upward sentence based on his high offender score, which would have otherwise resulted in crimes going unpunished. The trial court also imposed two $250 jury demand fees—one for each cause number.

Morgan argues that the trial court abused its discretion by granting the State's motion for joinder, that he received ineffective assistance of counsel when defense counsel stipulated to joinder, that the trial court violated his right to counsel at the sentencing hearing, and that the trial court erred by imposing jury demand fees.

We hold that Morgan waived his right to challenge the joinder on appeal, Morgan did not receive ineffective assistance of counsel, and any potential deprivation of counsel at sentencing was harmless, but the trial court erred by imposing the jury demand fees.

Accordingly, we affirm Morgan's convictions but remand to the trial court for the sole purpose of striking both jury demand fees.

FACTS

I. BACKGROUND

Morgan and his wife, Laura Morgan, had three daughters together: twins LM and EM, and a younger daughter, NM. Morgan volunteered as a youth wrestling coach in the community, sometimes even hosting wrestling practices at the Morgan family home.

EY lived nearby and was friends with the Morgan girls. She often spent time at the Morgan family's house. When EY was 14 years old, she spent the night at the Morgan family's

house. Because Laura[2] was out of town, Morgan was the only adult at home that night. The kids watched a movie and fell asleep in Morgan and Laura's bed. Later, EY awoke and found herself on top of Morgan in the bed. Her pants and underwear had been pulled down, and Morgan was touching her vagina. EY got off the bed and pulled up her pants, then woke up LM, the only other child still in the bed, and took LM with her to another room.

Months later, sometime in 2016, EY confided in her sisters about what had happened. Under pressure from her sisters, EY reported the abuse to her counselor. EY's counselor informed her father, and police conducted a forensic interview with EY in July 2016. She does not remember receiving any further updates from police regarding her case until 2020.

Following EY's report, investigators spoke with Laura. When Laura confronted Morgan about EY's allegation, he denied that EY had been at the house while Laura was gone. He told Laura that it never happened, and Laura believed him.

Meanwhile, sexual abuse occurred involving LM, EM, NM, AB, and BM.

When LM was 12 years old, she was watching TV in the living room, alone with her father when he asked her to sit on his lap. While she was on his lap, Morgan hugged her and slid his hand under her pants and underwear, touching her vagina. LM heard him grunting. LM pulled his hand out of her pants and ran to her room. LM did not report the sexual abuse because she was afraid Morgan would kill or hurt himself or her.

Additionally, LM recalled the incident when Morgan sexually abused EY. LM pretended to be asleep during the incident, but she saw Morgan and EY under a blanket and saw them

---

[2] Because the Appellant and his ex-wife, Laura Morgan, share the same last name, we use Laura's first name to distinguish the parties.

"moving up and down in the butt area." 1 Rep. of Proc. (RP) (Aug. 30, 2023, 58965-6-II) at 350.

LM recalled hearing grunting sounds. In another incident, LM recalled being in her parents' bed

with her twin sister, EM, and seeing Morgan put his hand in EM's pants, although she believed

EM was asleep during the incident. LM pulled Morgan's hand out of EM's pants and took EM

to their room.

EM, LM's twin sister, remembered a specific incident when she woke up with Morgan's

hand in her pants but over her underwear. Morgan pretended to be asleep, and EM took his hand

out of her pants. EM believed Morgan was pretending to be asleep because her dad tried to put

his hand back over her pants.

NM, Morgan's youngest daughter, was sleeping in her brother's bed when she was 11 or

12 when Morgan came into the room and got into bed with her.[3] Laying on her side, NM could

feel Morgan's body behind her, and Morgan put his hand under her underwear, touching her

vagina. At that point, Laura returned home and yelled for Morgan, so he got up and left the

room. NM spent the rest of the night awake, hiding under her brother's bed as her parents

argued. It was memorable to NM because Morgan moved out the next day. NM did not report

the sexual abuse because she was "terrified" Morgan would hurt or kill himself or her, or the

disclosure would destroy their family. 1 RP (Aug. 30, 2023) at 366.

AB is Morgan's great-niece. Because her parents were similarly aged to Morgan and

Laura, she grew up frequently playing with the Morgan children. One time, AB spent the night

at the Morgan family's house and was sleeping on the twins' bottom bunk while LM and EM

---

[3] NM's bedroom had flooded, and her brother was staying at their cousin's house.

4

shared the top bunk. She woke up and felt Morgan laying behind her while she laid on her side. Morgan's hand was under her pants and underwear, touching her vagina. She described his rough-feeling hand "cupping" her vagina and "rubbing a little bit." 1 RP (Aug. 30, 2023) at 424. She could feel his erect penis against her bottom, and he was thrusting toward her. AB described this and similar incidents occurring between 6 and 11 years of age.

Another time, when AB was 8 or 9 years old, she was at the Morgan family's house, playing a game outside with the other children, when Morgan took her inside and told the other kids to stay outside. He sat her on his lap. Morgan had AB's "right hand on his thigh, almost stroking his penis, but he was holding [her] hand and moving [her] hand with his own hand." 1 RP (Aug. 30, 2023) at 431. Morgan digitally penetrated her vagina while telling her, "babies are made like this, but instead you use your penis." 1 RP (Aug. 30, 2023) at 431.

BM lived with her parents in another state but spent her summers with family who lived near the Morgans. When she was visiting, she would wrestle on the team Morgan helped coach. One time, when she was 10 or 11 years old, she slept over at the Morgan family's house. She fell asleep on the living room floor along with her sister and the Morgan girls. She awoke and found herself being carried to the couch by Morgan. He laid down behind her on the couch and put his hand under her pants and underwear, touching her vagina. She pulled his hand out, stood up, walked to the bathroom, and cried.

Morgan and Laura separated in 2019 and filed for dissolution in March 2020. In 2020, while the dissolution was already pending, Laura received a phone call from AB's mother, Stephanie Buck. Buck informed Laura that Morgan had just called Buck to apologize for something that had happened between him and AB. LM overheard some of the phone call

5

between her mother and Buck and told her mother that something similar had happened to her too. Laura asked her other children if they had similar experiences with Morgan, and they told her about what had happened to them. Buck had a similar conversation with AB.

## II. PROCEDURE

In 2020, the State charged Morgan under cause number 20-1-00551-08. In the fourth amended information, the State charged Morgan with one count of rape of a child in the first degree, one count of rape of a child in the third degree, two counts of child molestation in the first degree, two counts of child molestation in the first degree—domestic violence, and one count of child molestation in the second degree—domestic violence. These charges involved five children.

In 2022, BM reported Morgan's abuse of her to the police. The State charged Morgan under cause number 22-1-00750-08 with one count of child molestation in the first degree.

During pre-trial proceedings, the State moved to join the two cause numbers for trial. Defense counsel stipulated to joinder, stating, "[w]e are actually prepared to stipulate on the record the joinder of these two cases for trial. . . . And so, there's no need for a separate hearing. I just wanted the Court to note that, we have no objection to the joinder." 1 RP (May 18, 2023) at 45. The court did not inquire further from defense. Accordingly, the trial court ordered joinder, writing that defense counsel stipulated that "the offenses charged in both causes are of same or similar character and/or are based upon the same conduct or [] on a series of acts connected together or constituting parts of a single scheme or plan." Clerk's Papers (CP) (58965-6-II) at 78.

6

III. TRIAL

At trial, witnesses testified consistently with the facts above. Laura testified that her marriage with Morgan began to deteriorate after investigators first questioned Morgan in 2016. When Laura and Morgan first separated, in 2019, Morgan moved into a second home next door, and the two shared custody equally with open visitation for all of the children. However, Laura testified that once she received the phone call from Buck in 2020, she immediately stopped the children from visiting Morgan. At the time of trial, the dissolution was still pending, and at issue were child support and custody, division of both Morgan homes, and "financial circumstances that are still outstanding." 1 RP (Aug. 30, 2023) at 403.

The State asked each victim whether they had discussed the case with the other victims, as well as how well each of them knew each other and had stayed in contact since the abuse occurred. Some of them testified that they had a general sense of the other victims' allegations, but they all agreed that nobody had told them what to say at trial. BM denied knowing EY.

Morgan advanced a theory of total innocence, arguing that Laura had colluded with the six victims to fabricate stories of abuse so that Laura could gain an advantage in their pending dissolution. *See* 1 RP (Aug. 30, 2023) at 320 (where in opening statements, defense counsel discussed the pending dissolution between John and Laura: "there's an interesting way to remove [John], basically, from the family. And that's exactly what has happened. . . . [B]ased upon these allegations that didn't happen.").

In closing argument, the State argued that the witnesses had not been told what to say and that the witnesses had not colluded. The State specified, "[n]obody told them what to say. None

7

of them are coordinating their stories together. You heard them testify that some of them didn't

even know some of the other people." 3 RP (Aug. 31, 2023) at 626-27.

In Morgan's closing argument, counsel reiterated, "Now, the defense here is obvious, and

that is that it didn't happen. . . . [t]he advantage the State has is that all their witnesses talk to

each other." 3 RP (Aug. 31, 2023) at 633.

Defense counsel acknowledged, "[o]f all of the allegations, there's one outlier, and that

outlier is [EY]. . . . I'm going to group the rest of the cases together, the rest of the charges, and

say that basically all of those charges began in . . . 2020." 3 RP (Aug. 31, 2023) at 636. Defense

counsel drove home its point while discussing EY's initial report of abuse in 2016:

> It was investigated, and there were no charges.
> . . . .
> So, I guess the first thing you should ask yourself as jurors is: if it wasn't
> enough in 2016, why is it enough today? And the answer to that is something that
> the prosecutor said, right? We don't—and her words were, "We don't have
> physical evidence, but we have our six girls." And so, the difference is, back in
> 2016, it was not enough for [EY] to simply say what she said. The difference is
> now that they've got a bunch of other girls to say the same thing.
> . . . .
> [Y]ou can look at it and say, actually, it's a situation where they all saw one
> individual they all knew and were aware of it, discussed among themselves, and
> now that it was convenient and prompted by the parents, prompted by the
> mothers. In fact, in this case, now there's disclosures, and they're all relatively
> similar to that incident back in 2016.

3 RP (Aug. 31, 2023) at 642-43.

Defense counsel contended that the case against Morgan was "really convenient for a

situation where there's a custody dispute and a divorce that started just fine and went real ugly."

3 RP (Aug. 31, 2023) at 646. Counsel described the case as "a situation where two best friends,

[Buck] and Laura, are, you know, in a position where they completely changed the outcome of

8

the divorce proceeding. Completely changed it from an amicable joint custody situation, to now

John has been cut out of the lives of all of the children." 3 RP (Aug 31, 2023) at 647. Finally,

counsel implored the jury,

> [T]his is probably the easiest scenario, is that you agree with my interpretation of
> the evidence: that there's collusion here. Their parents, the moms, have an agenda,
> and they're getting what they want. They've got what they want, and John was cut
> out of their lives. And now we're in a situation where John has had to fight for his
> life, but, you know, it didn't happen, right?

3 RP (Aug 31, 2023) at 650.

The jury found Morgan guilty on all counts and returned special verdicts finding that

Morgan and his three daughters were members of the same family or household.

## IV. SENTENCING HEARING

At sentencing, Morgan was in custody but was not transported to the courtroom and thus,

appeared virtually. *See* CP (58965-6-II) at 184 ("[Morgan] is in custody via Zoom.") (some

capitalization omitted). At no point during sentencing did the trial court appear to provide

Morgan with a method, or notice of a method, of communicating privately with his counsel.

Morgan did not object to sentencing being conducted virtually.

The trial court heard victim impact statements from all six victims. Several of the

victims' family members also provided statements.

Based on current offenses, Morgan's offender score was 21 points. The State requested

that the trial court impose an exceptional upward sentence because "Morgan . . . committed

multiple current offenses, and [his] high offender score results in some of those convictions

going unpunished." 2 RP (Oct. 11, 2023) at 505. The State further argued that Morgan "abused

his position of power as a father, uncle, neighbor, and coach to gain the trust and manipulate that trust to sexually abuse the most vulnerable in our community." 2 RP (Oct. 11, 2023) at 508.

The trial court also heard statements on Morgan's behalf. Morgan's brother stated that Morgan was caring and would go out of his way to help others. Morgan's stepmother stated that Morgan was a good person who was very honest.

Defense counsel requested that the trial court impose a sentence at the low end of the standard range—240 months for the most serious charge, with the rest of the charges running concurrently. Defense counsel stressed that Morgan maintained his innocence. Counsel argued, "my client, Mr. Morgan, has spent his life volunteering in the community, working with youth regarding his passion, which is wrestling." 2 RP (Oct 11, 2023) at 514-15. In his allocution, Morgan stated his respect for the court and the jury, stressing that he maintained his innocence.

While acknowledging the statements made in support of Morgan, the trial court stated,

> I have no doubt that prior to these acts occurring, [Morgan's] family and the people who knew him felt the same [positive] way. . . . And that, in many ways, makes this that much worse.
> Because his daughters, the people close to him, look to him, as someone said, [as] a protector, a father, an uncle, a coach, a friend. It makes dealing with what are pretty horrendous crimes even that much harder to deal with.

2 RP (Oct. 11, 2023) at 516. The court sentenced Morgan to an exceptional upward sentence of 714 months confinement.

Several days later, the parties reconvened with Morgan present in the courtroom to sign Morgan's judgment and sentence. Morgan did not raise an objection to the remote sentencing hearing that had occurred a few days prior. Attached to the judgment and sentence, the trial court included findings of fact and conclusions of law necessary for the exceptional sentence.

The court wrote, "[t]he court grants an exceptional sentence because the defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished." CP (58965-6-II) at 201; (58971-1-II) at 14. The trial court also imposed two $250 jury demand fees upon Morgan—one for each cause.

Morgan appeals.

## ANALYSIS

### I. JOINDER

Morgan argues that the trial court abused its discretion by granting the State's joinder motion because the trial court did not conduct an analysis on the record and joinder caused him undue prejudice. However, we conclude that Morgan waived his right to challenge the trial court's joinder order.

A. *Legal Principles*

CrR 4.3 governs joinder and is construed liberally, granting the trial court considerable discretion. *State v. Bluford*, 188 Wn.2d 298, 307, 393 P.3d 1219 (2017); *State v. Martinez*, 2 Wn.3d 675, 682, 541 P.3d 970 (2024). Generally, "where the charged offenses '[] are of the same or similar character, even if not part of a single scheme or plan, or [] are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan," joinder "should be liberally allowed." *Bluford*, 188 Wn.2d at 310 (internal brackets omitted) (quoting CrR 4.3(a)).

Once a trial court determines that joinder is allowable, it "should balance the likelihood of prejudice to the defendant against the benefits of joinder in light of the particular offenses and evidence at issue and carefully articulate the reasoning underlying its decision." *Id.* at 310. A

trial court should deny a motion for joinder if granting such a motion would unduly prejudice the defendant. *Martinez*, 2 Wn.3d at 681-82. To determine whether joinder causes prejudice in this context, the trial court considers four factors: "'(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.'" *Bluford*, 188 Wn.2d at 311-12 (quoting *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)). The trial court should analyze the issue on the record. *Id*.

We review the decision to grant a motion for joinder for abuse of discretion. *Martinez*, 2 Wn.3d at 681. An abuse of discretion occurs when a trial court's decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Id.* (quoting *State v. Barry*, 184 Wn. App. 790, 802, 339 P.3d 200 (2014)).

When multiple charges are joined properly, they will remain so joined for trial unless the trial court severs them under CrR 4.4. *Bluford*, 188 Wn.2d at 306 (citing CrR 4.3.1(a)). A party must move to sever charges before trial, and if that motion is denied, the party must later renew it "before or at the close of all the evidence." CrR 4.4(a)(2); *Bluford*, 188 Wn.2d at 306. "If the party does not timely make or renew a severance motion, 'severance is waived.'" *Id.* (internal brackets omitted) (quoting CrR 4.4(a)(1), (2)).

## B. *Morgan Waived His Right to Challenge Joinder*

Even though Morgan stipulated to joinder of his two cause numbers before trial and never subsequently moved to sever causes or counts, he now argues that the trial court abused its discretion by granting the State's motion to join without conducting an analysis on the record. We conclude that Morgan waived his right to challenge joinder.

In response to the State's motion to join both cause numbers, Morgan told the trial court there was no need for a hearing, he stipulated to joinder, and he had no objection. In so stipulating, Morgan relieved the trial court of the requirement to hold a hearing, and thus to conduct an analysis on the record. Moreover, Morgan never moved to sever the charges after joinder. Thus, he waived severance and any requirement for the court to conduct an analysis on the record. *See* CrR 4.4(a)(1), (2). Accordingly, because he waived any hearing and stipulated to the joinder without objection, we conclude that he waived his right to challenge the trial court's joinder order.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Morgan argues that defense counsel's representation was deficient because there was no strategic or tactical reason for stipulating to the State's motion to join the causes against him. We disagree.

### A. *Legal Principles*

For claims of ineffective assistance of counsel, the defendant bears the burden of showing both that defense counsel's representation was deficient and that counsel's deficient representation prejudiced the defense. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). "Failure to show either prong 'defeats' the claim. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

We "engage[] in 'a strong presumption that defense counsel's performance was reasonable.'" *Id.* (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). As long as defense counsel's actions constitute a "'legitimate trial strategy or tactic,'" defense counsel's

performance will not be considered deficient. *Id.* (internal brackets omitted) (quoting *Kyllo*, 166 Wn.2d at 863).

B. *Stipulating to Joinder Constituted a Legitimate Trial Strategy*

Here, defense counsel's stipulation to the State's motion to join does not rise to the level of deficient representation because it constituted a legitimate trial strategy based upon Morgan's defense theory of the case. Morgan's defense theory was that his wife, Laura, had colluded with the six child victims to fabricate allegations of abuse so that Laura would be advantaged in the Morgans' pending dissolution proceedings. Thus, having as many of the alleged conspirators as possible joined for trial would demonstrate the scale of the conspiracy.

Morgan employed this strategy at trial. In opening statement, Morgan told the jury the criminal charges were "an interesting way to remove [Morgan], basically, from the family. And that's exactly what happened. . . . [B]ased upon these allegations that didn't happen." 1 RP (Aug. 30, 2023) at 320.

In closing argument, Morgan contended the charges were "really convenient for a situation where there's a custody dispute and a divorce that started just fine and went real ugly." 3 RP (Aug. 31, 2023) at 646. He argued that best friends, Buck and Laura, "completely changed the outcome of the divorce proceeding." 3 RP (Aug. 31, 2023) at 647. He submitted that "[N]ow that they've got a bunch of other girls to say the same thing. . . . where they all saw one individual they all knew and were aware of it, discussed among themselves . . . prompted by the mothers." 3 RP (Aug. 31, 2023) at 642-43. Morgan concluded "there's collusion here. Their parents, the moms, have an agenda, and they're getting what they want. They've got what they

want, and [Morgan] was cut out of their lives. And now we're in a situation where [Morgan] has had to fight for his life, but you know, it didn't happen, right?" 3 RP (Aug. 31, 2023) at 650.

If defense counsel had not pursued this strategy, then in a second trial, the defense theory would be significantly weaker with the only victim being BM. Additionally, with BM in particular, the defense theory would be weaker because BM's relationship with the Morgans is more attenuated than the other victims.

Thus, we conclude that defense counsel's decision to stipulate to joinder of the causes constituted a legitimate trial strategy. Morgan fails to show that he received deficient representation, and as a result, his ineffective assistance of counsel claim is unavailing.

## III. RIGHT TO COUNSEL

Additionally, Morgan argues that the trial court violated his right to confer with counsel when he appeared virtually and the trial court failed to provide him with instructions on how to privately confer with counsel at sentencing. Assuming, without deciding, that Morgan can show manifest constitutional error, the State meets its burden to demonstrate harmlessness beyond a reasonable doubt.

A. *Legal Principles*

Both our federal and state constitutions guarantee a criminal defendant the right to counsel during critical stages of the proceedings against them. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22; *State v. Ferguson*, 34 Wn. App. 2d 908, 920, 568 P.3d 314 (2025) (published in part). Sentencing hearings are critical stages. *State v. Luthi*, 3 Wn.3d 249, 271, 549 P.3d 712 (2024).

15

The right to counsel includes the right of a defendant to confer privately with their counsel. *Ferguson*, 34 Wn. App. 2d at 920. When considering whether a trial court has violated a criminal defendant's right to confer with counsel, we "'consider the totality of the circumstances, *including* whether the trial court explicitly established a process for such communications, given the variety of different circumstances that may occur.'" *Id.* (quoting *State v. Bragg*, 28 Wn. App. 2d 497, 507, 536 P.3d 1176 (2023)).

This court may consider the denial of the right to confer with counsel for the first time on appeal if it constitutes a manifest error affecting a constitutional right. RAP 2.5(a)(3); *Ferguson*, 34 Wn. App. 2d at 920. "An error is of a constitutional dimension if it implicates a constitutional interest as opposed to another form of trial error." *Ferguson*, 34 Wn. App. 2d at 921. "An error is manifest if an appellant shows actual prejudice," which requires "a 'plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)).

Denial of the constitutional right to counsel is subject to a constitutional harmless error analysis. *Bragg*, 28 Wn. App. 2d at 504. Courts presume prejudice and the State bears the burden to demonstrate harmlessness beyond a reasonable doubt. *Id*.

B. *The State Demonstrates Harmlessness Beyond a Reasonable Doubt*

Morgan argues for the first time on appeal that the trial court violated his right to confer with counsel when he appeared virtually at sentencing and the trial court did not provide him with a method to communicate privately with his counsel. Specifically, Morgan contends that had he been able to confer privately with defense counsel, he would have been able to mitigate the 714 month sentence by urging defense counsel "to stress to the court the positive things

16

[Morgan] had accomplished and to emphasize [Morgan's] dedication to the youth wrestling program." Br. of Appellant at 44-45. Even if we assume, without deciding, Morgan shows manifest constitutional error, the State demonstrates harmlessness beyond a reasonable doubt.

Under RCW 9.94A.535(2)(c), a "trial court may impose an aggravated exceptional sentence without a finding of fact by a jury" if "[t]he defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished."

Here, the trial court was well within its statutory discretion to impose an exceptional upward sentence given Morgan's offender score of 21 points. Morgan suggests that had he been able to confer with counsel, counsel could have presented the "positive things he had accomplished" as well as Morgan's dedication to youth wrestling, such that the trial court would have decided not to impose an exceptional sentence. Br. of Appellant at 44. But the State argues the court imposed the exceptional sentence because Morgan committed multiple current offenses, causing a high offender score, such that crimes would go unpunished with a standard range sentence. This fact would remain true regardless of whether Morgan persuaded defense counsel to stress Morgan's positive accomplishments or his dedication to coaching youth wrestling.[4] Morgan would have reached an offender score of 9 points with just four convictions. The jury found Morgan guilty of eight child sex crimes involving six victims. This would have caused at least three convictions to go unpunished. Conferring with counsel to present additional

---

[4] It is also worth noting that when the parties reconvened several days after the sentencing hearing, and finally signed the judgment and sentence, neither Morgan nor his counsel attempted to present any of these mitigating arguments to the trial court, nor did either party object to the sentence imposed.

positive accomplishments would not have changed Morgan's 21-point offender score or number of convictions.

Additionally, the trial court had already acknowledged that family or community members felt Morgan accomplished positive things prior to the commission of the crimes. *See* 2 RP (Oct. 11, 2023) at 516. Moreover, the court heard and considered statements in support of Morgan from his family. Stressing Morgan's accomplishments, particularly his dedication to youth wresting, would not have persuaded the trial court to impose a lower sentence. Morgan's role as a youth wrestling coach—one of the positions that granted him access to children and at least one of his victims—made, according to the trial court, dealing with "pretty horrendous crimes even that much harder to deal with." Thus, we conclude that the State has demonstrated beyond a reasonable doubt that further emphasis of Morgan's coaching role or accomplishments would not have changed the outcome at sentencing.[5]

For these reasons, we conclude that the State meets its burden to demonstrate that any violation of Morgan's constitutional right to confer with counsel at sentencing was harmless beyond a reasonable doubt. Therefore, we hold that Morgan's claim fails.

IV. JURY DEMAND FEES

Finally, Morgan argues, and the State concedes, that we should remand for the trial court to strike the two jury demand fees imposed upon Morgan at sentencing. We agree.

---

[5] Morgan also posits, with no further argument, that counsel should have informed the trial court that Morgan had no prior criminal history. However, the trial court was aware of his criminal history. *See* CP (58965-6-II) at 191 and CP (58971-1-II) at 5.

18

No. 58965-6-II
Consol. No. 58971-1-II

Courts lack authority to impose jury demand fees upon defendants who are found indigent at sentencing, pursuant to RCW 10.01.160(3). RCW 10.46.190. Here, the trial court found Morgan to be indigent at sentencing. Accordingly, we remand to the trial court for the exclusive purpose of striking both jury demand fees.

CONCLUSION

We hold that Morgan waived his right to challenge the joinder on appeal, Morgan did not receive ineffective assistance of counsel, and any potential deprivation of counsel at sentencing was harmless, but the trial court erred by imposing the jury demand fees.

Accordingly, we affirm Morgan's convictions but remand to the trial court for the sole purpose of striking both jury demand fees.

A majority of the panel, having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, P.J.

Price, J.

19